The plaintiffs, Coy Carruth and others, appeal from summary judgments in these two cases.
These cases involve a fire at the home of Coy Carruth and his wife, Shirley Carruth. The plaintiffs, as the administrators of the estates of seven Carruth family members who perished in the fire, brought wrongful death actions against the manufacturer of the Carruths' smoke detector, Pittway Corporation. The actions were based on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), and on theories of negligent failure to adequately warn.
In the interest of brevity, our discussion will focus on the claims and arguments of Coy Carruth, but our discussion applies as well to the claims and arguments of the other plaintiffs, who, among other things, raise identical claims and arguments.
Broadly stated, at issue is whether, based on the matters and evidence properly before the trial court on the motion for summary judgment, Carruth 1) produced substantial evidence that a Pittway pamphlet that had accompanied the Carruth smoke detector conveyed an inadequate warning, and, if so, then 2) whether Carruth produced substantial evidence that the inadequate warning proximately caused the deaths of the seven family members.
The fire occurred on August 27, 1990. Two days before the fire, Carruth had installed a Pittway brand "First Alert Smoke and Fire Detector." The smoke detector was accompanied by a pamphlet explaining its installation, operation, and limitations as a safety device. Carruth says that Pittway inadequately warned consumers about where to locate the smoke detector in regard to wall-ceiling junctions, and that as a result of that inadequate warning he installed it too high on a wall surface for it to sound a timely alarm. According to Carruth, he inadvertently located the smoke detector within a "dead air space," an area that, he says, runs from the top of a wall (the wall-ceiling junction) to approximately four inches down the wall, and within which, he says, smoke will not travel so as to timely set off the detector's alarm. The Pittway pamphlet states: "Dead air spaces are often . . . in the corners between ceilings and walls. Dead air may prevent smoke from reaching a detector." Carruth alleges that because the detector *Page 1342 
was placed in a dead air space, it failed to sound a timely alarm, and he alleges that the failure to sound a timely alarm resulted in the deaths.
The Carruth house was a partially completed, two-story dwelling. The house had four habitable upstairs bedrooms. The record indicates that at the time of the fire, the seven who died were in the four bedrooms. In two of those bedrooms window air conditioning units were in use, and in the two others window fans were in operation.
Carruth testified that he did not read the Pittway pamphlet "in depth" before he installed the smoke detector and that he installed it near the ceiling on a first floor wall adjacent to the staircase to the second floor. After installing the detector on August 25, 1990, Carruth said, he tested the detector by depressing an alarm testing button on the unit, and he said he tested it again on the following day. He said that the smoke detector alarm activated during both tests. During the latter test, he said, one of those later killed, Brian Carruth, who was in an upstairs bedroom, came downstairs to tell Carruth, " '[C]ut it down, cut it down. It's too loud.' " Supp.R. 121.
On August 27, 1990, Shirley Carruth had already left the house to go to work when Coy Carruth awakened at 4:30 a.m. Carruth left the house to go to work at 5:00 a.m. At that time, six family members were sleeping upstairs. Another, Brian Carruth, was awake in an upstairs bedroom. Sometime between 5:00 a.m. and 5:30 a.m. a fire started in the kitchen on the first floor of the house. Six of the family members, including Brian, perished in their bedrooms; one escaped the house with severe burns and died two days later.
Coy Carruth sued Pittway, alleging, among other things, that Pittway had manufactured and sold a defective and unreasonably dangerous smoke detector and that the defect was the proximate cause of the seven deaths. Carruth also sued on a negligent-failure-to-adequately-warn theory, averring that Pittway had inadequately warned consumers about locating the detector at wall-ceiling junctions.
The trial court entered a judgment against Carruth on Pittway's motion for summary judgment.
A summary judgment is proper where there is no genuine issue of material fact. See Ala.R.Civ.P. 56; Berner v. Caldwell,543 So.2d 686 (Ala. 1989). If the moving party makes a prima facie
showing that there is no genuine issue of material fact, then the burden shifts to the nonmoving party to rebut this showing by "substantial evidence." "Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
To be considered by a trial court in opposition to a summary judgment motion, depositions and affidavits must be admissible under the rules of evidence. Enoch v. Firestone Tire RubberCo., 534 So.2d 266 (Ala. 1988). However, a party challenging the admissibility of such evidence must properly object to it; a failure to properly object in the trial court to the admissibility of such evidence results in a waiver of any objection to this Court's consideration of that evidence in reviewing a summary judgment. See McMillian v. Wallis,567 So.2d 1199 (Ala. 1990).
Our review of a summary judgment is de novo, and in determining the propriety of a summary judgment, we must view the evidence in a light most favorable to the non-moving party.Hightower Co. v. United States Fidelity Guar. Co.,527 So.2d 698 (Ala. 1988).
For this Court to determine whether the summary judgment was proper, we must first determine what evidence was properly before the court on the motion for summary judgment. More particularly, was critical testimony from James Munger, who Carruth presented as an expert on fire science and technology, admissible?
In the trial court, Pittway had moved to strike Munger's deposition testimony "on the grounds of his lack of expertise and inadequate foundations for his proffered opinions." The trial court did not rule on Pittway's *Page 1343 
motion to strike, and in ruling on Pittway's summary judgment motion it did not state whether it had considered Munger's testimony.
Alabama Code 1975, § 12-21-160, provides:
 "The opinions of experts on any question of science, skill, trade or like questions are always admissible, and such opinions may be given on the facts as proved by other witnesses."
Pittway argues that Munger's testimony cannot be considered by this Court, because it is inadmissible testimony and was properly objected to in the trial court on the ground that Munger is not qualified as an expert. Pittway says that Munger was not qualified to testify as an expert because "[h]is academic training is limited to a junior college degree" and he was "not an engineer."[1]
"To qualify as an expert, the witness must have such knowledge, skill, experience or training . . . that his opinion will be considered in reason as giving the trier of fact light upon the question to be determined." C. Gamble, McElroy'sAlabama Evidence, § 127.01(5)(b) (4th ed. 1991). "The criterion for the admission of expert testimony is that the witness, bystudy, practice, experience, or observation as to theparticular subject, should have acquired a knowledge beyondthat of the ordinary witness." Johnson v. State,378 So.2d 1164, 1171 (Ala.Crim.App. 1979) (emphasis added).
As to Munger's qualifications, the record indicates the following facts:
Munger had been a fireman for the City of Cullman for approximately three years and had been employed by the State fire marshal's office for approximately five years. When he gave his deposition, he was the president of a consulting firm specializing in "fire protection and code consulting." He had investigated over 700 fires, involving approximately 100 fatalities. Munger holds an associate degree in fire science from Wallace State Community College and a certification in fire prevention technology from Memphis State University. He is also nearing completion of the required course work for a bachelor's degree in fire prevention technology at Memphis State (he said "the only thing that I lack . . . is completion of a special project, which I think is seven hours.") Munger has completed numerous instructional courses offered through the National Fire Academy and other institutions, and he teaches courses for the National Fire Academy in fire detection systems, including their installation and operation.
Given the totality of Munger's experience and training, we are persuaded that Munger possessed the qualifications to testify as an expert in matters of fire science and technology.
Additionally, however, Pittway states that Munger disavowed the requisite expertise to determine smoke penetration within a dead air space, a question related to whether the Carruth detector timely sounded an alarm. Pittway says that this disavowal renders Munger's testimony inadmissible on the dead-air-space issues in question. However, our review of the testimony cited by Pittway as evidencing this "disavowal" does not support its contention.
Specifically, Munger stated that a precise computation of the speed of smoke flow within a given space can be done by using a specific computer program, but suggested that such computations are subject to inaccuracy. He disavowed awillingness to do the computation "longhand." He stated, as to his ability to perform "those kind of computations longhand," that "it's extremely improbable [that] an individual is going to do it by *Page 1344 
longhand if it takes a super computer hours and hours to accomplish that."
We do not agree that this testimony was a disavowal of expertise as to the critical questions addressed by Munger's testimony, whether smoke timely reached the Carruth detector.[2]
Pittway argues also that, assuming, as Carruth testified by affidavit, that the center of the of the detector was six inches below the wall-ceiling junction,[3] it is unrefuted that the sensing chamber within the detector would not have been located in the area alleged to be dead air space. We do not agree that this evidence is unrefuted. Munger testified that, in his opinion, "the smoke detector was located in a dead air space," indicating that he thought the entire detector was located within a dead air space. That a Pittway witness took a different position did not render Munger's testimony inadmissible. Rather, it indicates an issue of material fact.
Additionally, Pittway argues that it is undisputed that dead air spaces do not always occur at wall-ceiling junctions, because, it says, factors such as wind currents can cause smoke to penetrate what might otherwise be a dead air space. Pittway points out that Munger conceded that there is no way to be sure that smoke did not penetrate the area of the wall-ceiling junction. Pittway says that this renders Munger's testimony as to the dead-air-space questions inadmissible as lacking in probative value. We disagree. That Munger could not testify with absolute certainty as to whether smoke did or did not timely reach the detector does not render his testimony wholly lacking in probative value. We observe that by its very nature expert testimony is frequently in terms of hypothesis and probability, rather than in terms of certainties.
Because we are not persuaded that Munger's expert testimony was inadmissible, we now consider that testimony, Carruth's testimony, and evidence in the form of a copy of the Pittway pamphlet that accompanied the Carruth detector, to determine whether the trial court had before it substantial evidence that the pamphlet constituted a legally inadequate warning.
 Negligent-Failure-to-Adequately-Warn Claim
The elements of a claim based on a negligent failure to adequately warn are duty, breach, causation, and damages. "[T]he plaintiff must provide . . . evidence that [the] defendant breached a duty, and that the breach proximately caused the plaintiff's injury." Gurley v. American Honda MotorCo., 505 So.2d 358, 361 (Ala. 1987).
The issues raised by the parties as to Carruth's claim that Pittway negligently failed to adequately warn relate to the negligence elements of breach and causation. Pittway does not contend that it had no duty to warn about installation in dead air space, but, rather, that it did not breach its duty, and it contends that in any event Carruth showed no causal link between the alleged breach and the deaths. *Page 1345 
We will first address the parties' arguments as to the breach question — whether the Pittway pamphlet conveyed an inadequate warning about installation in dead air space.
As stated, Carruth concedes that he did not read "in depth" the pamphlet he complains of. He suggests that he was unaware of information about locating the detector in dead air space, even after casually scanning the pamphlet and observing information on the box the detector came in regarding where to locate the detector. He argues that the instructions in the Pittway pamphlet were so formidable in general that a consumer is discouraged from reading them fully. Carruth says that the breach of duty in this case comes from the Pittway pamphlet's presentation of information about dead air space concerns; he says those concerns were presented in a manner not calculated to attract the user's attention.
If a vital warning is not read by the user of a product because it is conveyed in such a way that it is " 'not calculated to attract the user's attention, due to its position, size, and . . . coloring,' " then it can constitute a legally inadequate warning. See E.R. Squibb Sons, Inc. v.Cox, 477 So.2d 963, 970 (Ala. 1985), quoting Spruill v.Boyle-Midway, Inc., 308 F.2d 79, 87 (4th Cir. 1962). The law does not require that necessary warnings be conveyed in the best way possible, Gurley, 505 So.2d at 361, but does require that they not be conveyed in a manner that effectively "prevents a consumer from reading them and being warned." E.R.Squibb Sons, Inc., 477 So.2d at 971.
Pittway argues that its pamphlet adequately conveys all the information that one needs regarding dead-air-space concerns.[4] However, a "warning might even be perfectly adequate with respect to wording," but there can still be a breach of due care if the warning "is such that it causes a potential plaintiff to fail to read the warning." E.R. Squibb Sons,Inc., 477 So.2d at 970.
In this regard, Pittway states that, "based on . . . a visual examination of the instructional material . . ., [Pittway] adequately gave warnings and instructions about the proper location of smoke detectors in residences."
Turning to an examination of that instructional material, the pamphlet, we observe the following:
The pamphlet covers such matters as installation of the detector, general fire protection advice, special effectiveness limitations for the hard-of-hearing, information on use in a recreational vehicle or mobile home, and wide-ranging cautionary statements. The size of the pamphlet's text print is approximately half to two-thirds the size of typical print in a newspaper and could be fairly characterized as tightly spaced. Section headings are approximately the size of print in a newspaper. The pamphlet is seven pages in length, with the first page alone containing over 900 words, inclusive of a table of contents. The words "warning," "caution," and "danger" are interspersed throughout the pamphlet, but no section of the pamphlet covers all cautionary statements or directs the user to the locations of all cautionary statements. Cautionary statements and information about dead-air-space matters are interspersed in the text of the pamphlet. The pamphlet is in black ink on a white background. None of the statements related to dead-air-space is captioned by the words "warning," "caution," or "danger," as are other cautionary statements.
We observe also that a diagram on the box the detector came in — that diagram, Carruth said, was where he got "a general idea of *Page 1346 
where would be the place, I thought, to put this [detector]" — could reasonably be understood to convey all the information one needs regarding where to locate the detector.
Specifically, the box has a colored, and highly visible, diagram that unequivocally purports to show effective "Detector . . . Locations in Typical 2-Story Home." This diagram clearly suggests that the area immediately below a wall-ceiling junction — an area indicated by the record to constitute a potential dead air space — is a suitable location for the detector.
Viewing the evidence most favorably to Carruth, one could reasonably infer that Pittway conveyed important cautionary information about dead-air-space concerns in a way "not calculated to attract the user's attention." See E.R. Squibb Sons, Inc., 477 So.2d at 970. Most particularly, from the pamphlet's format and print size, and the seemingly sufficient diagram on the box, a fair-minded person could reasonably infer that a user would be induced to only scan the pamphlet and thereby not get from the pamphlet the information about dead-air-space.
Accordingly, we hold that the evidence presents a jury question as to whether the Pittway pamphlet provided a legally adequate warning about dead-air-space concerns. However, Carruth's claim alleging a negligent failure to adequately warn would still fail if, as Pittway argues, Carruth failed to produce substantial evidence as to causation.
The crux of Carruth's claims is that the deaths in this case were proximately caused by the failure of the detector to sound a timely alarm (Carruth says that failure was caused by the failure of the pamphlet to properly alert him to dead-air-space concerns). Necessarily then, Carruth must show in support of his claim that the detector did not timely sound an alarm; otherwise, there is no causal link between the alleged breach of the duty to adequately warn, and the deaths. Pittway argues that the evidence indicated that the decedents were too far from the alarm to have heard it and, therefore, that one cannot reasonably infer, from the fact that everyone in the house at the time of the fire perished, that the alarm did not timely sound.
Viewing the evidence in a light most favorable to Carruth, we determine that there was substantial evidence that those in the house could have heard a timely alarm and that the detector did not sound a timely alarm.[5]
We agree with Pittway that there is no direct evidence that the alarm did not timely sound. The witnesses perished as a result of the fire. However, Pittway wrongly assumes that an absence of direct evidence as to matters of causation equates to a lack of substantial evidence. See Sears Roebuck Co. v.Harris, 630 So.2d 1018 (Ala. 1993). Circumstantial evidence can constitute "substantial evidence." Id. at 1026.
In the present case, Munger testified that had the detector sounded a timely alarm, it would have sounded at least 15 decibels over normal noise in the upstairs bedroom area; such an alarm would have been sufficient, he said, to awaken those persons upstairs. In taking into account the level of background noise around the time of the fire, Munger testified that it was his understanding that it was "pretty well stone quiet." When asked specifically about the existence of background noise from fans or air conditioning units in the bedroom areas, Munger stated that it was his understanding that "[t]here was no air conditioning running, there were no fans running." As our discussion of the facts of this case indicates, this was incorrect. It is undisputed that both fans and window air conditioners were in use in the bedroom area around the time of the fire.
Munger further testified, however, that "the tests that I've done — I've been able to show a decibel reading of 45 decibels over a quiet background, so you've got a substantial margin there to have still supplied the [necessary] 15 decibels over a background ambient noise." This testimony indicates that *Page 1347 
there could be, in Munger's opinion, a substantial range of background noise over which the detector alarm could still have timely alerted those persons in the house.
Also, Coy Carruth testified that Brian Carruth had heard the detector from an upstairs bedroom the last time it was tested by Carruth and had complained that it was "too loud." The record indicates that Brian Carruth was upstairs and had been awake on the morning of the fire. Munger testified that the positions of the bodies of those killed indicated that six of them, including Brian Carruth, had made no attempts to flee the fire. Another person escaped the dwelling with burns of such severity as to indicate, according to Munger, that the house was well ablaze before that person had attempted to escape. Munger's testimony indicates that those facts are inconsistent with a timely alarm.
Viewing the evidence most favorably to Carruth, we hold that there was substantial evidence from which fair-minded persons could infer that the lack of a timely alarm caused the deaths in question.
 AEMLD Claim
As to Carruth's AEMLD claim, Pittway argues that the undisputed evidence shows that if the detector did not sound a timely alarm, then Carruth caused this to happen by not using the detector as it was intended to be used. Pittway states that the detector was not intended to provide an unlimited audibility range and that when installed on the first floor it was intended to provide an audibility range within the first floor area. The Pittway pamphlet states: "Minimum coverage is one detector on each floor and one in each sleeping area." Pittway says that Carruth "misused" the detector and that his misuse entitled it to a judgment on his AEMLD claims.
Product misuse is an affirmative defense to an AEMLD action.Dennis v. American Honda Motor Co., 585 So.2d 1336 (Ala. 1991). Rule 8(c), Ala.R.Civ.P., requires that an affirmative defense be pleaded. See Robinson v. Morse, 352 So.2d 1355 (Ala. 1977). "[A] user's misuse of an allegedly defective product is an affirmative defense to liability under the AEMLD, which thedefendant must plead and prove." Harris, 630 So.2d at 1028 (emphasis added). Pittway did not plead product misuse. Therefore, the questions raised by Pittway's misuse argument are not properly before us.[6]
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, HOUSTON, INGRAM and COOK, JJ., concur.
[1] Pittway correctly states that in making the decision that a witness is or is not an expert for purposes of offering expert testimony, a trial court has considerable discretion. Lollar v.Tankersley, 613 So.2d 1249, 1253 (Ala. 1993); Hagler v.Gilliland, 292 Ala. 262, 292 So.2d 647 (1974). "Those decisions will not be reversed by this Court absent an abuse of discretion." Phillips v. Alamed Co., 588 So.2d 463, 465
(Ala. 1991). However, the application of this standard presumes that the record clearly indicates such a decision, which is not the situation here. We disagree with the parties' arguments that the trial court's decision on Pittway's motion was implied by its entry of a judgment in favor of Pittway (Pittway's argument) or by its not ruling on Pittway's motion (Carruth's argument).
[2] Pittway also disputes the adequacy of the foundation of Munger's testimony as to these matters. We do not address these contentions, because they are either unsupported by Pittway's accompanying citations to the record or are inadequately developed. In some instances, it is unclear what specific foundational facts Pittway contends were wrongly derived from evidence that it says was inadmissible. In many other instances, Pittway's citations to the evidence in question plainly fail to reveal the evidentiary problem Pittway advances. For example, Pittway complains of "hearsay information" conveyed to Munger about the "locations of the bodies," which evidence figured into Munger's opinions. In this regard, Pittway cites to Munger's testimony at Supp.R. 240. The testimony found in the record at Supp.R. 240, however, does not reflect the foundation of Munger's knowledge, much less that it was inadmissible hearsay. Munger stated:
 "[B]ased on the location of [six of] the victims, based on Mr. Carruth's information as to where he placed that smoke detector, based upon the fact that it is accepted in common practice that it should not be closer than four inches to the ceiling, it was in what is known as a dead air space — Mr. Carruth put it there — and the position of those victims indicate[s] that they were not given sufficient early warning."
[3] Previous testimony by Carruth was unclear as to whether his estimation of where he installed the detector was an approximation measuring from the wall-ceiling junction to the top of the detector, or to the center of the detector. The affidavit made it clear that his approximation of six inches was based on a measurement to the center of the detector.
[4] Although we do not reach this question, we observe the following about the dead-air-space information in the pamphlet: In the text of the pamphlet at pages 2 and 3 Pittway "suggest[s] that you" take care as to 12 different matters about locating the detector, including the suggestion that the user install the detector "between 4 and 6 inches . . from the ceiling." On the next page, as part of a lengthy discussion of how to avoid "nuisance alarms," the pamphlet states: "Dead air spaces are often . . . in the corners between ceiling and walls [(the wall-ceiling junction)]. Dead air may prevent smoke from reaching a detector." The reader is then referred to illustrations on the previous page. One of these illustrations denominates a "dead air space" and refers to the 4- to 6-inch installation area near the wall-ceiling junction, but fails to specify where the wall-ceiling junction is located on the illustration. The illustration, in this and other respects, could be viewed as confusing at best.
[5] Pittway does not argue that there is a lack of evidence that those in the house would or could have escaped the house had a timely alarm been sounded and heard by them.
[6] We note, additionally, that Pittway did not otherwise raise, on its motion for summary judgment, the issue whether, by placing the detector downstairs for upstairs coverage, Carruth misused the detector. This Court will not review matters not raised in the trial court. See Record Data Int'l, Inc. v.Nichols, 381 So.2d 1 (Ala. 1979).