## CIRCUIT COURT OF FAIRFAX COUNTY

Winchester Homes, Inc.

v.

Hoover Universal, Inc., et al.

### Case No. (Law) 100865

BY JUDGE GERALD BRUCE LEE

September 30, 1992

Plaintiff Winchester Homes, Inc. moved for a nonsuit on September 23, 1992 with regard to all of the Defendants, except Hoover Wood Treated Products, Inc., Ply-Gem Industries, Inc., and Timber Products Inspections, Inc. Although the Order of Nonsuit has been entered, the Court will hear arguments as to why the Order should be set aside or modified. The hearing on this matter is scheduled for Friday, October 9, 1992, the regular motions docket. The hearing shall last no longer than thirty minutes.

An additional hearing will be held on Thursday October 8, 1992, at 10 a.m. to memorialize the Court's September 16, 1992, ruling from the bench. Also motions for sanctions, which were pending at the time of the nonsuit, will be heard. This hearing is scheduled to last a maximum of two hours.

Assuming that the above named Defendants are the only ones remaining in this suit, Winchester's counsel, Michael McManus, has informed the Court that he expects only one trial and that it will last three weeks. The trial is scheduled for November 2–3, 9–12, 16–19 and 23–25, 1992.

As a pretrial matter if the jury voir dire can be handled expeditiously, valuable trial time will be saved. Accordingly, the Court will

send a questionnaire to the jury selection pool. Potential jurors will be required to answer this questionnaire at their jury education session, which occurs a week prior to trial. The Court will then entertain challenges for cause based upon juror responses before the jury panels are seated . . . . The Court requests that each party propose a maximum of thirty questions, which the Court will use in formulating a questionnaire for this case.

September 30, 1992

*Pretrial Conference Order*

The pretrial conference was held in this matter on September 17, 1992. After discussing the various issues presented, it was ordered [as follows].

## I. *Jury Procedures*

### A. *Jury Selection*

In addition to in court voir dire, the Court will allow the parties access to the jurors prior to the trial to ascertain background information and voir dire on specific issues.

1. *Questionnaire*: By October 9, 1992, each party is to submit a proposed jury questionnaire of questions to be propounded to the venire in advance of trial. The Court will determine which questions will be allowed.

2. *Costs of Preparation and Mailing*: The parties (including participating Defendants) will jointly share the cost of final preparation and mailing of the jury questionnaire to proposed jurors.

### B. *Jury Instructions*

Each party shall submit to the Court two days prior to trial any jury instructions that they wish to submit to the jury. The jury instructions shall include citations to the *Virginia Model Jury Instructions*, *Virginia Practice Instructions* or other sources as applicable. A copy of the instructions without citations shall be brought to Court for submission to the jury at the close of the trial.

1. *Special Verdict Forms*: Each party will present to the Court proposed special verdict forms on the first day of trial.

## II. *Evidentiary Exhibits*

A. All exhibits are to be pre-numbered in four notebooks, one for the jury, Plaintiff, Defendants, and Court, respectively. B. Each party is urged to use graphic exhibits and audio/visual demonstrative evidence where practical. C. Each side shall be allowed one sample of the alleged defective flame retardant plywood per defendant, size not to exceed four feet by eight feet. D. Parties are to rent or obtain and share the cost of a video recorder and three monitors (one for the Court and clerk, jury and counsel, respectively) or alteratively one monitor of sufficient size to be viewed by the Court and the jury. E. Counsel shall have name plates, stating counsel's name and client.

### III. *Procedures to Expedite the Presentation of Evidence*

A. *Statements of Facts and Evidence*

1. *Uncontested Facts*: Each side is directed to submit to the Court their statement of proposed uncontested facts by October 20, 1992. Among the facts the Court urges the parties to stipulate include:

    a. sale of plywood to Winchester by manufacturers;

    b. homeowners assignment to Winchester Homes;

    c. no personal injuries have occurred.

2. *Hearing*: A hearing will be held Thursday, October 22, 1992, at 10:00 a.m. for the purpose of considering uncontested fact statements. The time allotted for this hearing is not to exceed two hours.

B. *Witness Lists*

1. *Final Witness Lists*: Counsel shall exchange the final witness lists by October 19, 1992, fifteen days in advance of trial. Counsel for each party shall deliver to the Court and lead opposing counsel a copy of all exhibits and a list of the names of witnesses proposed to be called at trial. All other counsel are to receive a copy of the index of proposed exhibits and witness lists. No exhibit or testimony (name of witness) not identified and filed with the Clerk fifteen days in advance of trial shall be admitted into evidence, except for rebuttal or impeachment.

2. *Expert Witnesses*:

    a. Qualifications: Evidence of expert witness qualifications will be limited to the admission of curriculum vitae or resume at trial, unless a party objects to the qualification of an expert.

    b. Pretrial Hearing on Objections: A party contesting the qualifications of an expert shall file a motion and brief. The brief may not

exceed ten pages. An evidentiary hearing on the qualification of experts will be held on Thursday, October 15, 1992.

c. Expert Resume Exhibit: Each party will be permitted to submit an expert resume, not to exceed ten pages, for each expert witness.

## IV. *Exhibits and Preparation*

### A. *Notebooks*

Exhibits for each side shall be pre-marked and placed in three ring binder notebooks. Four notebooks shall be prepared, one copy for the jury, the Court, the Plaintiff and the Defendants, respectively. The parties shall supply an index of exhibits to the Clerk that will identify the exhibit and that will contain columns indicating whether the exhibit is to be admitted or excluded.

### B. *Objections to Documents*

Objections to proposed exhibits shall be filed by each party not later than October 29, 1992. The objections shall state the specific evidentiary grounds for the objection. The failure of a party to file written objections to a document shall be treated as waiver of the objection at trial except on the ground that the proposed evidence is cumulative. Objections as to the authenticity of a document are not to be asserted without good cause.

## V. *Time Estimates For Each Witness* (Direct and Cross-Examination)

### A. *Generally*

The Court is of the opinion that counsel have experience with the issues in this litigation and can estimate the anticipated length of time reasonably necessary to present properly direct and cross-examination of each witness. The Court requires that each party submit to the Court their written estimate of time for each witness by October 29, 1992.

### B. *Estimate of Time*

Each witness list is to contain a synopsis of the proposed witness's testimony and an estimate of time for direct and cross-examination. This estimate of time will not be used to limit proper examination of a witness. The court is collecting this information in order to properly advise the jury of the trial time and to make arrangements for court personnel and resources.

## C. *Allocation of Examination Time*

Counsel are further directed to meet and to determine in advance of trial which attorney will have lead responsibility for cross-examination of each particular witness. The lead cross-examiner on a particular witness shall be allocated a disproportionate amount of time in which to cross relative to the other counsel. However, each counsel shall be allowed reasonable time for examination of a witness who has made pertinent references to their client.

## D. *Repetitive Examination Disallowed*

The Court shall not allow repetitive cross-examination of a witness unless good cause is shown.

## E. *Adopt and Conform Objections and Motions*

Each party will be deemed to join in respective co-defendant objections to evidence made at trial and motions made at trial *unless* a party within 48 hours of testimony at trial files a written disavowal of a motion or objection for the record.

## F. *Twenty-Four Hour Notice of Witnesses*

Each party shall present to the Court each morning a list of witnesses that will be called on the following day.

### VI. *Trial Days*

The Court will hear the case every day, Monday through Thursday from 9:30 a.m. to 4:30 p.m. The schedule for November is as follows, November 2, 3, 9–12, 16–19, 23–25, 1992.

### April 16, 1993

This matter comes before the Court on Defendant Hoover Treated Wood Products, Inc.'s ("Hoover Treated") Application for Judgment Notwithstanding the Verdict or for a New Trial and Plaintiff Winchester Homes, Inc.'s ("Winchester") Motion to Conform Damage Award to Evidence Presented and Motion for Sanctions. Hoover Treated contends, *inter alia*, that the Uniform Commercial Code ("UCC") does not apply to the plywood at issue in this case since the plywood was incorporated into realty. Winchester asserts that the jury erroneously apportioned the verdict between Winchester and a non-party and that, at any rate, no evidence supported the jury's apportionment. Winchester also asserts that Hoover Treated's Grounds of Defense failed to

comply with the requirements of Va. Code Ann. § 8.01–271.1 (Repl. Vol. 1992) and that sanctions are appropriate.

Having considered the arguments and memoranda of counsel and for the reasons set forth below, the Court sustains the Application for Judgment Notwithstanding the Verdict and overrules the Motion to Conform Damage Award and the Motion for Sanctions.

### Facts

This is a products liability case brought by a builder-developer against a building supplier. The plaintiff-builder, Winchester, purchased flame retardant-treated plywood ("FRTP") from the defendant-supplier, Hoover Treated, for use as roof sheathing in townhomes. Several years after construction of 1500 or more townhomes, Winchester learned that FRTP was prematurely decaying in townhome roofs and launched an inquiry. As a result of this inquiry, Winchester entered into an agreement with the homeowners to repair or replace FRTP in exchange for a release and assignment of potential legal claims. Winchester brought suit against Hoover Treated on claims involving townhome roofs, contending that the FRTP was defective, unsafe, and unsuitable as roof sheathing.

This case proceeded, at differing times, on numerous theories, including negligent manufacture, negligent failure to warn, breach of the Virginia Consumer Protection Act, breach of the federal Magnuson-Moss Act, breach of implied and express warranties, and indemnification and subrogation. Winchester asserted standing to bring these claims as an assignee, subrogee, or indemnitee.

On September 16, 1992, the Court heard dispositive motions before trial. Hoover Treated's Motion to Strike/Demurrer/Plea in Bar/Summary Judgment was sustained in part and overruled in part. Winchester's indemnification claim was dismissed without prejudice because the cause of action for indemnification had not accrued before the time of filing. The motion for summary judgment was sustained, the Court ruling that Winchester disclaimed the Virginia implied statutory warranties under Va. Code § 55–70.1 (Repl. Vol. 1986 & Supp. 1992) and that the express warranties that Winchester gave to the homeowners excluded "roof sheathing." Accordingly, after September 16, 1992, Winchester proceeded as the assignee of the homeowners with two remaining claims, breach of express and implied warranties under the UCC.

On the opening day of trial, Hoover Treated filed a motion in limine, asserting that the UCC did not apply to the FRTP in question since it was incorporated into realty and no longer constituted "goods." Hoover Treated also asserted that any express or implied warranties must have been given by Winchester directly to the homeowners. Winchester's theory of the case was that Hoover Treated made implied and express warranties under the UCC and that these warranties initially ran to Winchester, the buyer of the FRTP. When Winchester incorporated the plywood into townhomes, warranties passed to homeowners under Code § 8.2–318 (Repl. Vol. 1991), the anti-privity statute.[1] The Court refused to consider Hoover Treated's motion on the first day of trial due to the potential unfair prejudice to Winchester.

After three weeks of trial, the jury returned a verdict for Winchester in the amount of $434,185. The jury found that Hoover Treated breached the UCC implied warranty of fitness for a particular purpose and express warranties. The jury found that Hoover Treated did not breach the UCC implied warranty of merchantability.

Hoover Treated now renews its pre-trial objection regarding the UCC by moving for judgment notwithstanding the verdict. Winchester has responded by moving to conform the damage award to the evidence and by moving for sanctions.

## Discussion

### I. *Motion for Judgment Notwithstanding the Verdict*

Under Virginia Code § 8.01–430, a court may set aside a jury verdict and enter final judgment only where the verdict is plainly wrong or without credible evidence to support it. *Dutton v. Locker*, 224 Va. 535, 297 S.E.2d 814 (1982). A court may also grant judgment notwithstanding the verdict where the verdict is predicated on a motion for judgment that does not state a cause of action entitling the plaintiff to recover. 11A Michie's Jur., *Judgments and Decrees*, § 28 at 66 (Repl.

---

[1] In its memorandum opposing the Application for Judgment Notwithstanding the Verdict, Winchester asserts that the representations made in the Home Care Manual distributed to each homeowner included express warranties given by Hoover Treated. Winchester also contends that the span-rating stamp printed on each sheet of FRTP was an affirmation by Hoover Treated to the homeowners that the plywood had certain strength characteristics. The Court rejects these theories for the reasons stated in Hoover Treated's Reply. In addition, the Home Care Manual was not introduced into evidence.

Vol. 1978); 46 Am. Jur. 2d, *Judgments*, § 114 at 389. Such a verdict may be set aside even if the defendant failed to demur. 6A Michie's Jur., *Demurrer*, § 29 Repl. Vol. 1991); *Burks' Pleading and Practice*, § 214 at 355 (4th ed. 1952); *Boyles' Adm'r v. Overby*, 52 Va. (11 Gratt.) 202, 204–05 (1854); *Mason v. Farmer's Bank*, 39 Va. (12 Leigh) 84, 90 (1841).

Hoover Treated argues that Winchester does not have a cause of action because it is an assignee of the homeowners, and the UCC warranties did not pass to the homeowners from Hoover Treated since the homeowners purchased realty, not "goods" as defined under the UCC. The Court agrees.

Two transactions were involved in this case — the sale of FRTP between Winchester and Hoover Treated and the sale of townhomes between Winchester and the homeowners. Not surprisingly, Hoover Treated focuses on the second transaction because the UCC does not apply to the sale of realty.[2] Winchester does not contend that the UCC is applicable to real estate transactions. Instead, it argues that the Court should focus on the first transaction, in which the FRTP constituted "goods" under the UCC. This transaction, Winchester asserts, was between the builder and the component manufacturer; all warranties given to Winchester, therefore, passed to the homeowners under § 8.2–318. No Virginia case exists which addresses this issue directly. *Bruce Farms, Inc. v. Coupe*, 219 Va. 287, 288, 247 S.E.2d 400, 401 (1978), is not dispositive because in that case the suit against the component manufacturer was nonsuited, and hence, the Virginia Supreme Court never addressed the pass-through issue.

---

[2] *See e.g., Bruce Farms, Inc. v. Coupe*, 247 S.E.2d 400, 402, n. 1 (Va. 1978); *G-W-L, Inc. v. Robichaux*, 643 S.W.2d 392, 394 (Tex. 1982); *Lupinski v. Heritage Homes, Ltd.*, 535 A.2d 656, 658-59 (Pa. Super. 1988); *Gable v. Silver*, 258 So. 2d 11, 17–18 (Fla. Ct. App. 1972); *Gallegos v. Graff*, 508 P.2d 798, 799 (Colo. Ct. App. 1973); *Fink v. Denbeck*, 293 N.W.2d 398, 401 (Neb. 1980); *Sponseller v. Meltebeke*, 570 P.2d 974, 976, n. 3 (Or. 1977); *Richards v. Powercraft Homes, Inc.*, 678 P.2d 427, 429, n. 3 (Ariz. 1984); *Arlen Hills North Homes Ass'n v. Pemtom, Inc.*, 475 N.W.2d 495, 499 (Minn. Ct. App. 1991); *Pollard v. Saze & Yalles Dev. Co.*, 108 Cal. Rptr. 174, 178 (Cal. Ct. App. 1973); *White v. Peabody Const. Co.*, 434 N.E.2d 1015, 1021 (Mass. 1982); *In re Levingston*, 119 B.R. 935, 941 (Bkrtcy. N.D. Miss. 1990); *Ferguson v. Alfred Schroeder Dev. Co.*, 658 S.W.2d 62, 64 (Mo. Ct. App. 1983); *Vernali v. Centrella*, 266 A.2d 200, 203 (Conn. Ct. App. 1970); *see also* R. Anderson, *Uniform Commercial Code*, at 572–73 (3d ed. 1981).

To determine which transaction resolves the rights of the parties, Hoover Treated focuses on the language of the Code. Article 2 of the UCC applies only to "transactions in goods." § 8.2–102. "Goods" are defined as "all things . . . which are moveable at the time of identification to the contract for sale." § 8.2–105. Hoover Treated then argues that, since Winchester is the assignee of the homeowners, the only relevant contracts are those involving the homeowners. Since the FRTP was not movable when identified by the homeowners' contracts of sale, the UCC is inapplicable.

This analysis is not self-evident. Virginia is unique among the states because it has an anti-privity statute while the UCC's applicability in other states is more circumscribed. Virginia Code § 8.2–318, in pertinent part, provides:

> Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express, implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods.

Code § 8.2–318 allows the UCC warranties to extend down the chain of distribution. Hence, citation to the simple UCC language, such as "transactions in goods" or "identification to the contract of sale," is not dispositive of the issue. The question remains as to which transaction should be examined to determine whether the transaction involves "goods." If the first transaction is focused on, the homeowners in this case would likely fall within the language of the anti-privity statute because the FRTP constituted "goods" at that time and the homeowners were "person[s] whom the manufacturer . . . might reasonably have expected to use, consume or be affected by the goods." § 8.2–318.

Nonetheless, the Court finds since the FRTP was subsequently incorporated into realty, extending the UCC's applicability under § 8.2–318 to such building components would be against public policy.[3] Hence, the second transaction determines the rights of the parties.

---

[3] Home appliances, such as dishwashers, refrigerators or air conditioning units, may remain "goods" under the UCC. *See e.g.*, § 8.2–107. However, building components,

Virginia Code § 8.1–102(2)(c) states that an underlying purpose of the UCC is "to make uniform the law among the various jurisdictions." No case cited by either party indicates that the § 8.2–318 pass-through feature makes the UCC applicable to realty.[4] Indeed, if the UCC was interpreted to apply to components incorporated into realty, the result would be extraordinary. *See, supra,* n. 2. While § 8.2–318 obviously relaxed the UCC requirement of privity, it did not extend privity so far as to eviscerate the Code's uniform inapplicability to realty.

Another policy reason § 8.2–318 should not be interpreted to apply to building components is that component manufacturers would then become the primary warrantors of residential housing instead of developers, and such a change would have broad economic consequences. Currently, the UCC implied warranties do not pass to the purchasers of residential housing. Rather, purchasers receive consumer protections under Virginia Code § 55–70.1 from the developer. Under § 55–70.1, the developer bears the economic costs of faulty construction and may bargain with the purchaser and disclaim the statutory warranties.

If the UCC were interpreted to apply to the purchase of residential housing, there would be dramatic economic consequences. If the UCC implied warranties given by the component manufacturer pass through to the purchaser of residential housing, the developer would have no incentive to extend warranties. Consumers would then look to the component manufacturer instead of the developer for protection, and the protections given by the General Assembly under Code § 55–70.1

---

such as mortar, dry-wall and plywood that are transformed into a building, would not stand on the same footing as "goods" under the UCC. The Court also notes that a different case would be presented if the parties were in direct privity. In such a case, there would be no need to rely upon § 8.2–318.

[4] *See, Coakley & Williams, Inc. v. Shatterproof Glass,* 778 F.2d 196, 198 (4th Cir. 1985) (interpreting an analogous Maryland statute which differs from Virginia statute because Maryland expressly eliminated privity by expanding definition of seller while Virginia expanded definition of buyer and seller); *Fair Hill Condominium v. Olney Town Center, et al.,* At Law No. 72478 (Montgomery Co. Cir. Ct. Md.) (same); *Herman v. Bonanza Builders, Inc.,* 390 N.E.2d 536 (Neb. 1986) (court looked at the transaction between the builder and consumer because that was the only transaction before the court); *Twin Lakes Mfg. Co. v. Coffey,* 222 Va. 467, 473 (1981) (holding a mobile home is a good); *Basham v. General Shale,* 377 S.E.2d 830 (W. Va. 1988) (irrelevant as indicated by note 1 in Winchester's Response); *Coastal Modular Corp. v. Laminators, Inc.,* 635 F.2d 1102 (4th Cir. 1980) (same).

would be irrelevant.[5] Furthermore, the potential liability of the component manufacturer would increase as additional uses of the manufacturer's product would then be under warranty. This, in turn, would result in increased component costs as the manufacturers attempt to spread the costs of greater liability to consumers. Finally, and perhaps most importantly, the Virginia Supreme Court has held that where the change in the law is significant, the proper forum to address the issue is the General Assembly, not the courts.[6] In *Bruce Farms, Inc. v. Coupe,* 219 Va. at 293, 247 S.E.2d at 404, the Court held that:

> [where an issue involves] a multitude of competing economic, cultural and societal values . . . courts are ill-equipped . . . . On the other hand, the legislative machinery is specially geared to the task. A legislative change in the law is initiated by introduction of a bill which serves as public notice to all concerned. The legislature serves as a forum for witnesses representing interests directly affected by the decision. The issue is tried and tested in the crucible of public debate. The decision reached by the chosen representatives of the people reflect the will of the body politic. And when the decision is likely to disrupt the historic balance of competing values, its

---

[5] The interpretation of § 8.2–318 extending the UCC to building components is not warranted by the equities of this case. Winchester provided an extensive homeowner's warranty insurance policy to its customers. That policy excluded roof sheathing and, therefore, could not form the basis of Winchester's cause of action. In the homeowners' sales contracts, Winchester expressly disclaimed all implied statutory warranties under Code § 55–70.1 and all other express warranties. Winchester now asserts that Hoover Treated extended express and implied warranties in an effort to place the economic costs of roof replacement upon Hoover Treated. If this Court were to interpret the UCC to apply to the homeowners, it would be extending more protection to the homeowners than Winchester actually provided. This is not a case where consumers have fallen through their roofs or where consumers have been personally or financially injured. Winchester has replaced all of the affected roofs. Hence, this case involves nothing more than the shifting of economic costs.

[6] The General Assembly has been investigating the Commonwealth's FRTP problems. The Department of Housing and Community Development submitted a report to the Assembly in its 1993 session in which the Department recommended extending the protections of Code § 55–70.1 to include FRTP roof sheathing. Department of Housing and Community Development, Report to the General Assembly of 1993, H. Doc. 24, at 10, 13, 15 (1993).

effective date can be postponed to give the public time to make necessary adjustments.

The Court finds that the General Assembly has not sufficiently indicated an intent to extend the UCC under § 8.2–318 to include building components. Arguments extending the UCC's applicability should be addressed to the legislature, not to this Court.

Therefore, the Court holds that the appropriate transaction to focus on is the second one, which involves Winchester's sale of townhomes to the homeowners. As a result of the public policy considerations stated above, Winchester may not focus solely on the transaction between it and Hoover Treated, and no UCC warranties passed through to the homeowners, or to Winchester as their assignee, from Hoover Treated under § 8.2–318. The second transaction determines the rights of the parties. The UCC did not apply to this transaction because it involved realty. *Bruce Farms, Inc.*, 219 Va. at 289, n. 1, 247 S.E.2d at 402, n. 1. Accordingly, Winchester lacks a cause of action, and the Court grants the Application for Judgment Notwithstanding the Verdict and will enter an order granting judgment to the Defendant.

Since the Court holds that the UCC is inapplicable, the Court's determination of this threshold issue moots the remaining matters in the Application for Judgment Notwithstanding the Verdict, as well as Winchester's Motion to Confirm Damage Award.[7]

## II. *Motion for Sanctions*

The Court overrules Winchester's Motion for Sanctions. This was a very complex case in which the Third Amended Motion for Judgment was more than 150 paragraphs long. The Court has conducted at least five hearings on dispositive motions.

In general, the Court believes that each side in this dispute has spent a significant amount of time and money bringing sanctions against each other. Hoover Treated joined a Joint Motions for Sanctions, which was heard after the September 16, 1992, hearing and was based

---

[7] The Court notes that both parties objected to the Court's use of a special verdict form. The Court ruled that a special verdict form was necessary in this complex case in order to guide the jury in its deliberations. *Cf.* § 8.01–377 (Repl. Vol. 1992). The Court opines that the verdict form is useful to the trial and appellate courts in reviewing the jury findings regarding multiple warranty claims in complex litigation. Further, the use of special verdict forms is recommended by the Manual for Complex Litigation. *Manual for Complex Litigation, Second,* § 21.633 (1985).

upon Winchester's failure to assert valid claims for indemnification and subrogation. The Court overruled this motion. Winchester now has filed a motion for sanctions since the jury has returned a verdict in its favor.

Sanctions are not appropriate merely because a party loses a motion or a case. Nor are sanctions appropriate because a defense is ultimately unsuccessful. Rather the standard is whether counsel has filed a pleading that is "well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." § 8.01–271.1. Since Hoover Treated has prevailed in its Application for Judgment Notwithstanding the Verdict, it had an adequate basis, "warranted by existing law," for denying liability. Therefore, the Court overrules the Motion for Sanctions.