830 So.2d 1 (2002)
Doug KECK and Theresa Keck
v.
DRYVIT SYSTEMS, INC., et al.
1001175.
Supreme Court of Alabama.
January 18, 2002.
Rehearing Denied April 12, 2002.
*3 Brent L. Crumpton, Birmingham, for appellants.
T. Michael Brown, Matthew H. Lembke, and Jeffrey M. Anderson of Bradley, Arant, Rose & White, L.L.P., Birmingham, for appellee Dryvit Systems, Inc.
William Anthony Davis III and Blake D. Andrews of Starnes & Atchison, L.L.P., Birmingham, for appellee Apache Products Company.
John W. Clark, Jr., and Bradley J. Smith of Clark & Scott, P.C., Birmingham, for appellee Dillard Plastering Company.
E. Britton Monroe of Lloyd, Gray & Whitehead, P.C., Birmingham, for appellee Michael N. King & Associates.
Eric D. Hoaglund and Martha R. Cook of McCallum Law Firm, L.L.C., Vestavia Hills, for amicus curiae K2, Inc.
James Jerry Wood, general counsel, Home Builders Association of Alabama, Inc., Montgomery, for amicus curiae Home Builders Association of Alabama, Inc.
LYONS, Justice.

I. Facts And Procedural History

Doug Keck and Theresa Keck appeal from a summary judgment in favor of three defendants: Dryvit Systems, Inc.; Apache Products Company; and Dillard Plastering Company (hereinafter referred to collectively as the "Dryvit defendants"). The Kecks had sought to recover for damage allegedly caused by the application of an exterior insulation finishing system ("EIFS") to the Kecks' home. The EIFS was manufactured by Dryvit, distributed by Apache, and installed by Dillard. (The Kecks also allege that Dillard was a seller of EIFS.) The Kecks are the second owners of the residence they allege was damaged by the EIFS. The EIFS was applied to the structure of the house when it was built in 1994; the Kecks purchased the house in 1996 from the original owner.
The EIFS is a multilayered exterior wall system consisting of Styrofoam insulation board glued to the exterior wooden substrate previously affixed during construction of the house, a base coat into which is embedded mesh, and a finish coat designed to look like stucco. The EIFS is not completely waterproof, and water cannot drain out of the system if it, in fact, penetrates the system. The EIFS is dependent upon sealants to protect a house to which the EIFS has been applied from water intrusion. According to the Kecks, their home sustained damage because of the failure of the EIFS to prevent water intrusion behind the system.
The Kecks filed a complaint against the Dryvit defendants on November 23, 1999, alleging breach of express and implied warranties, negligent design, negligent supervision, negligent installation, negligent failure to warn, breach of contract, fraud, suppression, and violations of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). The Kecks presented evidence in the form of interoffice memoranda and articles published in trade magazines suggesting that Dryvit Systems, Inc., had actual knowledge that the design of the EIFS was defective, that the addition of a drainage system to the EIFS was technologically feasible, and that the EIFS was being routinely and systematically misapplied by trained applicators, including Dillard. In support of their suppression claims, the Kecks presented affidavits to the trial court in which they state that *4 they were not aware of the problems with the EIFS application and drainage when they purchased their home. According to the Kecks, had they been aware of these facts they would not have purchased a house clad with an EIFS.
In addition to damage to their house, the Kecks also claim that they suffered mental anguish and emotional distress as a result of the Dryvit defendants' conduct. Doug Keck submitted an affidavit to the trial court in which he states that he and his wife worried that their house was having significant problems caused by the failure of the EIFS. Keck's affidavit stated that, as a result of the problems with his house, he suffered from ongoing stress, anxiety, sleeplessness, and an inability to focus mentally. In addition, Keck stated that he felt a constant sense of worry and apprehension about his house and possible future problems with the safety and stability of the structure.
The trial court entered a summary judgment in favor of the Dryvit defendants, holding 1) that the doctrine of caveat emptor barred the Kecks' claims for damages based upon breach of the implied warranty pursuant to this Court's decision in Boackle v. Bedwell Constr. Co., 770 So.2d 1076 (Ala.2000), 2) that the EIFS is not a "product" for purposes of the AEMLD because once applied it becomes the exterior wall of the building, 3) that the Dryvit defendants owed no duty of disclosure to the Kecks and that there was no evidence indicating that the Dryvit defendants had made any representations directly to the Kecks, and 4) that the Kecks' negligence claims were barred because, the trial court held, the Kecks failed to present substantial evidence of personal injury necessary to avoid the application of the doctrine of caveat emptor. This appeal followed.

II. Standard of Review

The standard by which this Court will review a motion for a summary judgment is well established. To grant a motion for a summary judgment the trial court must determine that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. See Bass v. SouthTrust Bank, 538 So.2d 794 (Ala. 1989). When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact. Id. at 798. Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In our review of a summary judgment, we apply the same standard the trial court applied. Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala. 1997).

III. AEMLD Claim

The Kecks first contend that the trial court erred in holding that the EIFS is not a "product" for purposes of the AEMLD. According to the Kecks, the trial court should not have relied on this Court's decision in Wells v. Clowers Construction Co., 476 So.2d 105 (Ala.1985), in determining that the EIFS is not a product. The Kecks argue that Wells has been modified by more recent caselaw explaining that an object does not cease to become a product merely because it is attached to real property. See Bell v. T.R. Miller Mill Co., 768 So.2d 953 (Ala.2000). Citing a number of recent cases, the Kecks argue that this *5 Court has repeatedly held that "products" remain "products" despite being affixed to real property. See Carrell v. Masonite Corp., 775 So.2d 121 (Ala.2000); Dillard v. Pittway Corp., 719 So.2d 188 (Ala.1998); Beam v. Tramco, Inc., 655 So.2d 979 (Ala. 1995); Carruth v. Pittway Corp., 643 So.2d 1340 (Ala.1994); and Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.1993). According to the Kecks, just as defective fiberboard siding, roof shingles, light switches, or smoke detectors are affixed or incorporated into a house and do not lose their character as "products," a defective siding product such as the EIFS does not lose its character as a "product" merely because it is attached to a house.
The Dryvit defendants argue that the EIFS cannot constitute a product under the AEMLD. According to the Dryvit defendants, this Court made clear in Wells that attachments or improvements to realty that become as much a part of a house as the four walls cannot be considered a product under the AEMLD. 476 So.2d at 106. Because the EIFS is a multilayer exterior wall system that actually constitutes the four walls of the Kecks' home, the Dryvit defendants argue that the EIFS cannot be considered a product for purposes of the AEMLD.
The AEMLD is a judicially created accommodation of Alabama law to the doctrine of strict liability for damage or injuries caused by allegedly defective products. See Casrell v. Altec Indus., Inc., 335 So.2d 128 (Ala.1976). Our caselaw has not heretofore clearly set forth factors to be considered in determining whether an object constitutes a "product" for purposes of the AEMLD. Contrary to the Kecks' argument that this Court has held that a number of items, including a gas water heater, Masonite siding, a smoke detector, a sliding glass door, a conveyor belt, a cylindrical rotary soybean conditioner, and a diving board are products under the AEMLD, this Court has only examined the issue of what constitutes a product under the AEMLD twice, in Wells v. Clowers Construction Co., supra, and Bell v. T.R. Miller Mill Co., supra.
In Wells, the purchaser of a house sued the builder of the house under the AEMLD, alleging that a fireplace in the house had been negligently constructed. 476 So.2d at 106. This Court held that the plaintiff's claim was barred, as a matter of law, because the fireplace did not constitute a product for purposes of the AEMLD. According to the Court, "[o]nce affixed to a house, a fireplace becomes as much a part of that house as the four walls, and a house cannot be classified as a `product' for purposes of the AEMLD." 476 So.2d at 106. Wells provided little guidance regarding what factors are to be taken into account in determining what attachments or improvements to realty actually become "as much a part of [a] house as the four walls."
In Bell v. T.R. Miller Mill Co., 768 So.2d at 956, this Court again dealt with the question of when an item constitutes a "product" for purposes of the AEMLD. In Bell the plaintiff filed a wrongful-death action against the manufacturers of a telephone pole, based upon the AEMLD. Id. at 954. The action arose out of an automobile accident in which the plaintiff's automobile hit a sagging telephone line. The plaintiff's daughter was ejected from the automobile and died as a result of the accident. Id. The primary issue in Bell with regard to the plaintiff's AEMLD claim was whether a telephone or utility pole, despite having been installed in the ground, was a "product" for purposes of the AEMLD. 768 So.2d at 955. The defendant, citing Wells, argued that, because the telephone pole was installed in the *6 ground and was securely attached to the land, it was a structural improvement and, as such, could not be classified as a "product" for purposes of the AEMLD. Id. at 956. Noting that "the policies underlying the application of the AEMLD ... have little relation to the policies underlying the fixtures doctrine, and that the application of products-liability law should not be totally dependent upon the intricacies of real-property law," this Court held that although the telephone pole "was installed in the ground and was attached to the property, it did not by that fact lose its character as a `product' for purposes of the AEMLD." 768 So.2d at 957. Although Bell was intended to clarify the rationale from our holding that the law of fixtures cannot be uniformly applied to productsliability law, Bell was viewed by some as a departure from this Court's decision in Wells.
Now that the question is squarely presented to us again, we take this opportunity to define with greater clarity when an item attached to realty may be considered a "product" for purposes of the AEMLD. We reaffirm our holding in Bell that the law of fixtures is inapplicable to determining what constitutes a product for purposes of the AEMLD. The question whether an item attached to realty may be considered a product for purposes of the AEMLD must be based on the underlying policies of product-liability law in Alabama, not on the law of fixtures. When considering whether an item attached to realty constitutes a "product" for purposes of the AEMLD, we must consider the overall function and life span of the item.
The owner of a house or of any building should reasonably expect that many components will have the same useful life as the house or building itself and will not need to be replaced over the life of the building. Such components include, by way of example, an exterior brick wall, a staircase, or a fireplace. There are also certain components of a house or a building the purchaser reasonably expects to wear out and to require replacement in the course of normal and ordinary usage, such as roof shingles, a dishwasher, a furnace, or a hot-water heater. Whether an item that is incorporated into real property may be considered a "product" for purposes of the AEMLD is determined by whether the item is a part of the structural integrity of the house or building that is reasonably expected to last for the useful life of the house or building. If it is, then the item cannot be considered a "product" for purposes of the AEMLD. However, if the item is attached or incorporated into real property and, yet its very function and nature clearly makes it an item that one would reasonably expect to repair or to replace during the useful life of the realty, the item may be considered a "product" for purposes of the AEMLD. For instance, although paint, when applied to the structure of a wall, becomes incorporated into the surface of the wall, paint is a structural improvement that does not have the same useful life as the wall itself or the building to which the wall is attached; one would expect to have to repaint a wall to maintain the quality of the first application. Therefore, paint would be considered a product for purposes of the AEMLD.
Our decisions in Wells and Bell are both consistent with this test. A fireplace is generally built into the structural integrity of a home and is expected to last for the useful life of the house or building to which it is attached. A fireplace is not a component that one would expect to have to replace because of ordinary wear and tear; under this test, therefore, a fireplace cannot be considered a "product" for purposes of the AEMLD. A telephone pole, although *7 not a component of the structural integrity of a home or building, is attached to real property; however, telephone poles require maintenance and, when necessary, replacement. The fact that the telephone pole is attached or incorporated into real property does not, alone, cause the telephone pole to lose its character as a "product" for purposes of the AEMLD.
Applying the above test, we are compelled to hold that the EIFS cannot be considered a "product" for purposes of the AEMLD. The EIFS is a multilayered exterior wall system that actually composes the exterior walls of a building. Once applied, the EIFS becomes a part of the structural integrity of the building and actually is the exterior wall of the building. By virtue of the very function of the EIFS as an exterior wall system, the EIFS could not be a structural component of a building that one might expect to replace after normal wear and tear. A stucco exterior wall is the equivalent of a brick wall; it is a part of the structural integrity of a housea homeowner expects it to be weather resistant and to endure for the entire useful life of the house. Therefore, the EIFS cannot be considered a product for purposes of the AEMLD.
Other courts have reached varying results when confronted with the applicability of the doctrine of strict liability, upon which the AEMLD was patterned, to components of buildings. An example of a court reaching a result similar to the one this Court reached in Wells is Walker v. Shell Chemical, Inc., 101 Ill.App.3d 880, 428 N.E.2d 943, 57 Ill.Dec. 263 (1981). That case was later discussed in Boddie v. Litton Unit Handling Systems, 118 Ill. App.3d 520, 529, 455 N.E.2d 142, 149, 74 Ill.Dec. 112, 119 (1983):
"Our holding in Walker [v. Shell Chemical, Inc., 101 Ill.App.3d 880, 428 N.E.2d 943, 57 Ill.Dec. 263 (1981) ] should not be read so broadly as to incorporate the law of fixtures into products liability law. What items are to be deemed products must be based on the underlying policies for strict liability in tort to which the law relating to fixtures is only tangentially relevant. Walker imposes a limitation on the application of strict liability only with regard to those items which are an indivisible part of the building structure itself, such as the bricks, supporting beams and railings. Such items are significantly different than a conveyor system housed in a building since they do not have an indivisible identity prior to installation but are rather indivisible component parts of the building itself."
The dissenting opinion argues for strict construction of Casrell v. Altec Industries, Inc., 335 So.2d 128 (Ala.1976). The dissent supports its rationale by urging that we apply the "plain-meaning rule," a respected rule of legislative interpretation, to the judicial function of deciding cases in light of prior precedent. Judges are charged by oath with the duty of applying the laws enacted by the Legislature. Judges are not similarly bound by oath to conform to opinions handed down by predecessors in office. Consequently, when deciding a case dependent upon the Legislature's intent in enacting a statute, a judge functions under limitations on judicial authority that cannot be equated with the scope of judicial power when the judge is deciding a case that does not turn upon legislative intent. Judicial authority in this latter category of cases, which involves only the wisdom of the application of prior precedent to a new fact pattern, is constrained by the wholly separate doctrine of stare decisis.
Judges adhering to the rule of stare decisis defer to prior precedent to obtain the beneficial effect of predictability in the law even when enticed to embrace *8 what appears to be a more logically sound rule. However, the rule of stare decisis does not support the plaintiffs here, where the tendency of our prior decisions supports a ruling for the defendants, as evidenced by the fact that virtually every circuit judge who has considered this issue, bound by oath to follow precedent from this Court, resolved the issues before us today in favor of the defendants. In short, the plain-meaning rule urged by the dissenting opinion simply does not apply to this case.
Judicial decision-making should not be seen as the opportunity to legislate and, to the extent Casrell stands as an example of judicial legislation, it is time for this Court to defer to the Legislature for further expansion of the sweep of its holding.

IV. Implied-Warranty Claim

The Kecks also contend that the trial court erred in entering a summary judgment in favor of the Dryvit defendants as to their claim alleging breach of the implied warranty of merchantability. The Kecks argue that in B & B Properties v. Dryvit Systems, Inc., 708 So.2d 189 (Ala. Civ.App.1997), the Court of Civil Appeals correctly held that the EIFS was a "good" within the meaning of the UCC. According to the Kecks, Alabama has eliminated the requirement of privity in an implied-warranty claim under the UCC, when the plaintiff is alleging personal injury. See Bishop v. Sales, 336 So.2d 1340, 1345 (Ala. 1976). Because, they argue, mental anguish constitutes "injury to the person" under Alabama's version of the UCC, the Kecks contend that their implied-warranty claim is not barred by the doctrines of caveat emptor or privity of contract.
The Dryvit defendants argue that the Kecks' implied-warranty claim fails as a matter of law because, they say 1) the EIFS is not a "good" within the meaning of the UCC, 2) the Dryvit defendants were not "sellers" within the meaning of the UCC, and 3) the Kecks were not in privity with the Dryvit defendants as Alabama law requires.
Article 2 of the Uniform Commercial Code as enacted in Alabama generally provides that a warranty of merchantability is implied in a contract for the sale of goods. § 7-2-314, Ala.Code 1975. The UCC defines "goods" as "all things ... which are moveable at the time of identification to the contract for sale." § 7-2-105(1), Ala. Code 1975. As defined within the UCC, "goods" may include "things attached to realty." Id. The test for determining whether an attachment to realty is a good under the UCC is whether the "thing" attached to the realty is capable of severance without material harm to the realty. Paragraph 1, Official Comment to § 7-2-105, Ala.Code 1975.
Thus, in order to be considered a product within the meaning of the UCC, the EIFS must be capable of severance from the Kecks' home without causing material harm to the home. Because of the nature and character of the EIFS, we cannot say that the EIFS can be detached from the house without causing significant harm to the house. The EIFS is a multilayer system that composes the exterior wall of the Kecks' home. The EIFS was attached to the underlying sheathing of the Kecks' home during construction of the home. Once incorporated into realty, the EIFS loses its distinct characteristic as a "good" and becomes an integral part of the structure of a home. Removing the EIFS from the Kecks' home would damage the underlying sheathing of the house and the overall structural integrity of the house, leaving the house exposed to the elements. Because removal of the EIFS would unquestionably result in material harm to the Kecks' home, the EIFS cannot be considered *9 a "good" within the meaning of the UCC.
The dissenting opinion finds an opinion of a Virginia circuit court in Stoney v. Franklin, (No. CL00-387, June 18, 2001) 44 U.C.C. Rep. Serv.2d 1211 (Va.Cir.Ct. 2001), to be persuasive. If Virginia circuit court opinions are to be the currency of the realm, then the persuasive opinion of another Virginia circuit court in BayPoint Condominium Ass'n, Inc. v. Dryvit Systems, (No. CL99-475, April 3, 2001) (unpublished), also deserves consideration. The court, in addressing liability under the Virginia Uniform Commercial Code in an action alleging failure of Dryvit, held:
"In sum, the parties are in disagreement as to what transaction should be focused on and whether or not the EIFS is a good within the meaning of the UCC. There are cases to support the plaintiff['s] position[;] however[,] those cases involved products that remained a `good' of some sort, i.e.[,] moveable and distinct. The Court recognizes that Virginia has a broad anti-privity statute under the UCC[;] however[,] the product at issue must still be a good. Dryvit maintains that the statute does not apply in this case because the product was incorporated into realty. The Court has thoroughly considered the cases, briefs, and arguments of counsel and agrees with the other circuit court decisions such as Winchester [Homes, Inc. v. Hoover Universal, Inc., 30 Va. Cir. 22 (1992) ], [Board of Directors of] Providence Village [Condo. Association v. Allied Plywood Corp., 27 UCC Rep. Serv.2d 884 (Va.Cir.Ct.1995) ], and MacConkey [v. F.J. Matter Design, Inc., (No. CL98-2582, February 8, 2000) ]. The EIFS at issue in this case was a good at one time, but once it was incorporated into the walls of the units it ceased to be a `good' in that it lost any distinctive characteristic it once had.

To hold otherwise would be to hold that any `building component' used in the construction of any building contains a manufacturer's warranty applicable to remote plaintiffs simply because it was a good at some time. If this was the intent of the legislature in enacting the anti-privity statute then the General Assembly is the proper forum to specifically address the issue regarding building components incorporated into realty."
(Emphasis added.)
Because the EIFS cannot be considered a product under the UCC, we pretermit any discussion of whether the Dryvit defendants were "sellers" within the meaning of the UCC and whether the Kecks' implied-warranty claim was barred by the doctrine of privity of contract.

V. Negligence Claims

The Kecks also contend that the trial court erred in applying the doctrines of caveat emptor and contractual privity, thereby barring their negligence claims. We disagree. The lack of privity between the Kecks and the Dryvit defendants forecloses such claims because the Kecks are not the initial purchasers of the house. See Boackle v. Bedwell Constr. Co., supra.
Even if the law of privity were inapplicable to this case, the Kecks' negligence claims would nevertheless fail, because the Kecks have failed to prove that the Dryvit defendants owed them a duty. An ultimate consumer can recover on a negligence claim against a manufacturer even in the absence of privity of contract
"`[w]here one party to a contract assumes a duty to another party to that contract, and it is foreseeable that injury to a third partynot a party to the contractmay occur upon a breach of that duty, the promissor owes that duty *10 to all those within the foreseeable area of risk.'"
Ex parte Grand Manor, Inc., 778 So.2d 173, 178 (Ala.2000) (quoting Harris v. Board of Water & Sewer Comm'rs of the City of Mobile, 294 Ala. 606, 613, 320 So.2d 624 (1975)).
The Kecks rely primarily upon this Court's decision in Ex parte Grand Manor to argue that even in the absence of privity, the Dryvit defendants owed them a duty because, they argue, they were foreseeable victims of the EIFS failure. According to the Kecks, it was foreseeable that the house to which the EIFS was affixed might, in today's highly mobile society, be resold and that by the time the EIFS began to fail homeowners subsequent to the initial purchasers would be living in the house.
In Ex parte Grand Manor, the plaintiffs sued the manufacturer of a mobile home they had purchased, alleging various claims, including negligent manufacture. 778 So.2d at 175. The plaintiffs based their negligence claim on the repeated failure of electrical outlets, overflowing toilets, damaged and flawed cabinets and molding, uneven tile, and doors that would not close. Id. at 176. Grand Manor, the manufacturer of the home, argued that the plaintiffs could not assert a negligence claim against it because, it argued, the plaintiff and Grand Manor were not in privity of contract; Grand Manor had sold the mobile home to a retailer who had then sold it to the plaintiffs. Id. at 178.
We rejected Grand Manor's argument because the facts of the case clearly indicated that it had manufactured the mobile home specifically for the plaintiffs. Id. Grand Manor had contracted with the retailer to manufacture a mobile home for the plaintiffs according to their specifications. Because the relationship between the parties indicated that Grand Manor was manufacturing a mobile home for a specific clientthe plaintiffsas opposed to mass producing a generic home to sell to retailers, we found that the plaintiffs were within the foreseeable area of risk and that Grand Manor owed the plaintiffs a duty to manufacture the mobile home with reasonable care. Id.
In the present case, the Dryvit defendants did not enter into a contract to manufacture and apply the EIFS to a house owned by the Kecks. As subsequent purchasers of the house, the Kecks had no relationship with, and no other contact with, the builder of the house or any of the Dryvit defendants. Because the Kecks did not enter into a contract with the Dryvit defendants to apply the EIFS to the house, because the Kecks were not the intended purchasers of the house when the EIFS was applied during the construction of the house, and because the Dryvit defendants could not have anticipated when or if the Kecks would purchase the house, the Dryvit defendants owed the Kecks no duty to manufacture and apply the EIFS with reasonable care.

VI. Fraudulent-Suppression Claim

The Kecks also argue that the Dryvit defendants fraudulently suppressed material facts concerning the allegedly defective nature of EIFS. The Kecks contend that the trial court erred in finding, as a matter of law, that the Dryvit defendants owed no duty to disclose the alleged defects in the EIFS. According to the Kecks, the Dryvit defendants have known for well over 15 years that the EIFS was defective but they made no attempts either to change the design of the product, to stop selling it, or to warn foreseeable users of its defective nature. The Kecks argue that if they had known that the EIFS was defective, they would have never purchased a house clad with the EIFS.
*11 The Dryvit defendants argue that the Kecks' fraudulent-suppression claim fails because, they say, they owed no duty of disclosure to the Kecks as subsequent purchasers of a house clad with the EIFS. According to the Dryvit defendants, duty requires a relationship between two or more parties that can be shown only through a history of contacts, conversations, and circumstances. See State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 839 (Ala.1999). Because the Dryvit defendants had no contract with the Kecks, no knowledge that the Kecks owned a house clad with the EIFS, and no contact with the Kecks before this lawsuit, the Dryvit defendants argue that no confidential relationship existed between them and the Kecks requiring disclosure. We agree.
In order to establish their claim of fraudulent suppression, the Kecks were required to prove 1) that the Dryvit defendants had a duty to disclose material facts; 2) that the Dryvit defendants concealed or failed to disclose those facts; 3) that the concealment or failure to disclose those facts induced the Kecks to act or to refrain from acting; and 4) that the Kecks suffered actual damage as a proximate result. See Owen, 729 So.2d at 837; Boackle v. Bedwell Constr. Co., 770 So.2d at 1080. A party's mere silence as to a material fact does not constitute fraud unless that party is under a duty to disclose that fact. Owen, 729 So.2d at 837. A duty to disclose can arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case. § 6-5-102, Ala.Code 1975; Ex parte Farmers Exchange Bank, 783 So.2d 24, 27 (Ala. 2000). We must agree with the Dryvit defendants that the evidence presented in this case would not support a finding of a confidential relationship or any special circumstances justifying the imposition of a duty to disclose.
Dryvit Systems, Inc., manufactured and sold the EIFS to Apache, who in turn distributed the EIFS to Dillard, who applied it. The EIFS was applied during the construction of the Kecks' house. The Kecks did not purchase the house from the builder after it was constructed, but purchased it two years later from the first owner of the house. The Dryvit defendants had no contractual relationship with the Kecks, no knowledge that the Kecks owned a house clad with the EIFS, and no contact with the Kecks prior to this lawsuit. To allow the Kecks to assert a claim of fraudulent suppression against the Dryvit defendants would impose an endless duty upon the manufacturers and sellers of construction materials to disclose alleged defects in materials to every purchaser of a used house, no matter how far removed those purchasers were from the original purchaser and hence from the manufacturer and seller. The imposition of such a responsibility is a matter best left to the Legislature. Because of the absence of any relationship between the Kecks and the Dryvit defendants, we find as a matter of law that the Dryvit defendants owed no duty of disclosure to the Kecks.

VII. Conclusion

Based upon the evidence in this case, we are compelled to hold that the trial court did not err in entering a summary judgment in favor of the Dryvit defendants. The judgment of the trial court is affirmed.
AFFIRMED.
HOUSTON, SEE, BROWN, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
JOHNSTONE, J., concurs in part and dissents in part.
WOODALL, J., recuses himself.
*12 JOHNSTONE, Justice (concurring in part and dissenting in part).
I concur in affirming the summary judgment against the plaintiffs on their fraudulent-suppression claims. I respectfully dissent, however, from affirming the summary judgment against the plaintiffs on their AEMLD claim, their implied warranty claim, and their negligent-design claim. I will discuss only their AEMLD claim and their implied warranty claim.
The new definition of product announced by the main opinion in addressing the AEMLD claim effectively abolishes the Alabama Extended Manufacturer's Liability Doctrine (AEMLD) in claims for one class of dangerously defective manufactured building materials or components but not in claims for another class of dangerously defective manufactured building materials or components, without any precedential or policy justification for discriminating between the two classes. This new definition will foreclose AEMLD claims against the manufacturers, suppliers, and sellers of dangerously defective bricks, mortar, concrete, nails, bolts, girders, beams, trusses, laminated trusses, pilings, and other vital structural materials, members, and fasteners, as well as other materials and components that are irretrievably integrated into the structure of buildings. Yet this new definition will accommodate AEMLD claims for dangerously defective components that are more transient and less vital to the safety and happiness of the owners and occupants of the buildings.
In Casrell v. Altec Industries, Inc., 335 So.2d 128, 132-33 (Ala.1976), this Court, through all nine of its then incumbent Justices, unanimously held:
"We now extend the doctrine of `manufacturer's liability,' and by definition this doctrine shall include not only the manufacturer, but also the supplier and the seller. We do not intend to impose a no-fault concept. On the other hand, we adhere to the tort concept of fault. Under the `extended manufacturer's liability doctrine,' we opine that a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law. As Dean Wade [On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 828 (1973)] suggests, we hold scienter is supplied as a matter of law, and there is no need to prove its existence as a matter of fact. In other words, the fault or negligence of the defendant is that he has conducted himself in a negligent manner by placing a product on the market causing personal injury or property damage, when used to its intended purpose. As long as there is a causal relationship between the defendant's conduct and the defective product, he is held liable because he has created an unreasonable risk of harm. Liability subject to allowable legal defensesattaches solely because the defendants have exposed expected users of a product not reasonably safe to unreasonable risks. This is morally and legally correct.
"To establish liability, a plaintiff must show:
"(1) he suffered injury or damage[ ] to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"(a) the seller is engaged in the business of selling such a product, and
"(b) it is expected to and does reach the user or consumer without substantial *13 change in the condition in which it is sold.
"(2) Showing these elements, the plaintiff has proved a prima facie case although
"(a) the seller has exercised all possible care in the preparation and sale of his product, and
"(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.
"By extending the doctrine of manufacturer's liability, we are not invading the province of the Legislature. Developing case law is a proper role for this court, and that is what we are doing in this case. We are here removing the defense of due care in the manufacture and sale of the product. The care with which a defective product is manufactured and sold is now immaterial, when given the allegation and proof of injury resulting proximately from the product's defective condition."
(Footnote omitted.) The Casrell Court did not limit the meaning of the term product to any specialized definition.
In a different but pertinent context, this Court has held:
"The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where the plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect. Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County, 589 So.2d 687 (Ala. 1991)."
IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992). While the IMED holding emphasizes deference to legislative prerogative, the fundamental premise of the IMED plainmeaning doctrine is that, as a general rule, lawmakers say what they mean and mean what they say. When this Court sets a precedent, as it did in Casrell, this Court makes law, for better or for worse. In performing this function, the Justices of this Court are lawmakers, albeit within the strict confines of § 43, Ala. Const.1901 (allocating the powers of government among the three branches of state government). In performing this function, the Justices of this Court must be presumed to say what they mean, to mean what they say, and to intend the plain meaning of their words. Any departure from the plain meaning of a term in a precedent is, therefore, a change in the law and, to that extent, a new law. I respectfully submit that this Court should not make a new law that is injurious to the public.
In the absence of precedent defining the term product, its plain meaning would be its dictionary meaning. Webster's Ninth New Collegiate Dictionary and Merriam Webster's Collegiate Dictionary (10th ed.), both define product as "something produced." Black's Law Dictionary 1209 (6th ed.1990) defines product as
"[g]oods produced or manufactured, either by natural means, by hand, or with tools, machinery, chemicals, or the like. Something produced by physical labor or intellectual effort or something produced naturally or as a result of natural process as by generation or growth." (Emphasis added.)
These definitions are entirely consistent with each other. Today's decision redefines the term product to exclude building *14 materials, members, and components that are irretrievably and permanently incorporated into a house or other building. This redefinition of the term product is a pronounced departure from, and restriction on, the plain, common, ordinary meaning of product as typified by the dictionary definitions.
Our precedent of Wells v. Clowers Constr. Co., 476 So.2d 105 (Ala.1985), recognized and cited by the main opinion, does not require today's change in the law. In Wells, the third owner of a house asserted his AEMLD claim against only the original builder of the house, and for only the defectiveness of the fireplace originally built into the house. The Wells plaintiff did not, as do the plaintiffs now before us, assert an AEMLD claim against any manufacturer, supplier, or seller of any materials or components. The Wells court held only that "[o]nce affixed to a house, a fireplace becomes as much a part of that house as the four walls, and a house cannot be classified as a `product' for purposes of the AEMLD." 476 So.2d at 106. While Wells excludes houses from the definition of product and thereby protects homebuilders against AEMLD claims for the defectiveness of integral parts of houses, no aspect or policy of Wells militates in favor of extending such protection to the manufacturers, suppliers, or sellers of dangerously defective materials, members, or components integrated into the structure of houses or other buildings. Rather, considerations of public health and safety militate against any such extension of Wells and militate against the change in the plain meaning of product wrought by today's decision.
The integration of building materials, members, and components into the structure of buildings in accordance with the purpose of those materials, members, or components intended by the manufacturers, suppliers, and sellers in no way detracts from the character of those materials, members, or components as products. Rather, the legally significant effect of integrating dangerously defective materials, members, and components into the structure of buildings is to place the dangerousness where it poses the greatest hazard to health and safety. Therefore, the integration of the materials, members, or components into the structure of buildings hardly justifies the effect of today's decision to insulate those manufacturers, suppliers, and sellers from AEMLD responsibility.
Thus, I respectfully submit that, for AEMLD cases, we should define product as anything a manufacturer produces. Manufacturers, and the suppliers and sellers of those products, can hardly complain that such a definition is unfair. With such a definition, the plaintiffs before us would be entitled to a reversal of the summary judgment entered against them on their AEMLD claim.
My reason for dissenting from affirming the summary judgment against the Kecks on their implied warranty claim is that the EIFS system can be considered a "good" as defined by the Uniform Commercial Code, § 7-2-105, Ala.Code 1975. The persuasive case of Stoney v. Franklin, 44 UCC Rep. Serv.2d 1211 (Va. Cir. Ct.2001), analyzing the same applicable Uniform Commercial Code sections that are incorporated in the Alabama Code, explains:
"[T]he defendants assert that the UCC also does not apply to sales of immovable improvements to real estate. The term `goods' includes things `which are movable at the time of identification to the contract for sale' and can include fixtures to realty if they are intended `to be severed from realty.' Va.Code Ann. § 8.2-105(1) (Michie 1991). The building supplies complained about in the motion *15 for judgment were all incorporated into the residential building. They did not at that time involve movable goods, or for that matter, identifiable goods intended later to be severed from the realty. The building itself constitutes an improvement to realty, a fixture qualifying for the status of real property every bit as much as the land itself.
"This analysis is certainly right, as far as it goesbut it only goes so far. It proves that the UCC does not apply to the sale of the residence because it constitutes both a services contract and a sale of an improvement to realty. And, for that reason, the plaintiffs cannot sue the builder for breach of any UCC implied warranties. In this case, however, no such claim has been asserted. Instead, the plaintiffs seek to enforce the implied warranties made by the manufacturers and assemblers of the building products. Those transactions clearly involved sales of goods, not contracts for services or real estate. Under Va.Code Ann. § 8.2-105(1), goods exist if they `are movable at the time of identification to the contract of sale.' In context, the `contract of sale' identifying the goods refers to the sale involving the seller that made the implied warranty not simply the party with whom the claimant contracted.

"Unless disclaimed, implied warranties accompanying goods extend under Virginia's anti-privity statute to any `person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods.' Va.Code Ann. § 8.2-318....
". . . .
"The logical consequences of the defendants' argument go far beyond the circumstances of this case. If a claimant loses his implied warranty claims against upstream defendants because an intervening contract for services took place, then personal injury or death claims (no less than claims for economic losses) would be barred. For example, if a repairman tuned up the boiler and in the process replaced a piece of the equipment (with the predominant thrust of the transaction still being a services contract), no implied warranty claims could be asserted against the part maker if that same part, because of an inherently defective design, caused the boiler to explode and fatally injure the homeowner who hired the repairman. Likewise, under the defendants' argument, a person killed when a defectively manufactured elevator drops to the bottom of the shaft would have no implied warranty claims against the elevator manufacturer if, as will almost always be the case, the elevator was installed in the building during its construction. These examples cannot be dismissed as an exaggerated parade of horribles. They demonstrate how the position advanced by the defendants would unsettle settled principles of product liability law." (Second emphasis added.)
Like the Virginia anti-privity statute (Va.Code Ann. § 8.2-318), § 7-2-318, Ala. Code 1975, eliminates any privity requirement between a seller or manufacturer and a consumer in the consumer's implied warranty action for personal injury. Bishop v. Faroy Sales, 336 So.2d 1340 (Ala. 1976). Mental anguish resulting from damage to a home is a legally recognizable and compensable form of personal injury. Southern Energy Homes, Inc. v. Washington, 774 So.2d 505 (Ala.2000). See also F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630 (1932), and Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301 (Ala.1991). Therefore, the plaintiffs before us are entitled to a reversal of the summary judgment entered *16 against them on their implied warranty claim.