PITTMAN, Judge.
Robert N. Barrett and Tracy C. Barrett appeal from summary judgments entered by the Madison Circuit Court in favor of Carlos Roman d/b/a Carlos Roman Roofing (“Roman”) and Bobby Beach d/b/a Just Brick It Masonry (“Beach”). We affirm.
I. Facts and Procedural History
This is the second time this case has been on appeal. Our supreme court dismissed the first appeal as having been taken from a nonfinal order. See Barrett v. Roman, 143 So.3d 144 (Ala.2013). On remand, the trial court disposed of all pending claims, and the case is now ripe for appeal.
In July 2006, Jonathan Whitten obtained a building permit from the City of Huntsville for the construction of a residence on a piece of real property Whitten owned. At the time he began construction, Whit-ten intended to occupy the residence with his family. Whitten’s long-time friend, Robert Fugate, who had experience as a homebuilder, agreed to help Whitten with the construction.
At some point before the house • was completed, Whitten decided that the construction was taking too much of his -time, that he and his family were not going to live in the house, and that he would sell the house once construction was finished. Accordingly, “at the framing stage,” Whit-ten asked Fugate to take over the construction of the house completely. Whit- *368 ten also promised to split -with Fugate any profit from the sale of the property. Fu-gate agreed to the proposed arrangement. Neither Whitten nor Fugate was licensed as a homebuilder during any phase of the construction, which was completed in April 2007.
On January 20, 2008, the Barretts agreed to purchase the residence from Whitten. On February 29, 2008, the Bar-retts closed on the purchase. Whitten and Fugate each made $45,000 in profit from the sale of the house.
According,to the Barretts, “shortly after moving into the residence,” they discovered that water was leaking into the house. Relevant to this appeal, the Barretts claim that numerous building defects, including defective roofing and brick work, caused the leaks.
On May 10, 2010, the Barretts sued Whitten and fictitiously named defendants in the trial court, stating claims of fraudulent suppression, negligence and waritonness in the construction of the house, breach of express and implied warranties of habitability, breach of an implied warranty of good workmanship, and a violation of the Alabama Deceptive Trade Practices Act, § 8-19-1 et seq., Ala.Code 1975. The Barretts later-amended their complaint on July 9, 2010, to add a breach-of-contract claim.
On August 31, 2010, Whitten filed a third-party complaint against Roman, Beach, and Ronnie Smith'. Whitten as■serted in his third-party complaint that he had acted as the builder “during a portion of the construction” of the residence and that Smith, Roman, and Beach were three of his subcontractors. The parties .agree that Roman roofed the house and that Beach performed the brick-masonry, work. Although Smith has not appeared in the action, it appears that he may have been responsible for the framing work on the residence.
Whitten alleged in his third-party complaint that, if the Barretts’ assertions regarding the defects in the house had merit, then Smith, Roman, and Beach were responsible. Whitten stated claims against the third-party defendants based on theories of common-law indemnity; breach of express and implied warranties regarding their work, labor, and materials; and breach of their duty “to exercise reasonable care, and to comply with [their] contractual and warranty obligations.” Roman and Beach answered the third-party complaint and denied liability; Smith, who was served with the summons and complaint, never appeared in the action. In May and June 2012, respectively, Roman and Beach each filed a motion for a summary judgment on Whitten’s third-party claims against him,
'On July 26, 2012, the Barretts filed a second amended complaint, in which they named Smith, Roman, and Beach as additional defendants. The Barretts also asserted in their second amended complaint that Whitten had, “on or about July 26, 2012,” assigned to the Barretts “his rights to make any claims against the subcontractors.” Accordingly, the Barretts asserted against Smith, Roman, and Beach the same claims that Whitten had made in his third-party complaint, namely, claims based on theories of common-law indemnity; breach of express and implied warranties regarding Smith’s, Roman’s, and Beach’s work, labor, and materials; and breach of Smith’s, Roman’s, and Beach’s duty “to exercise reasonable care, and to comply with [their] contractual and warranty obligations.” The Barretts also included against Smith, Roman, and Beach separate counts asserting breach of an implied warranty of good workmanship and *369 breach of contract.1 Finally, the Barretts stated direct claims against Smith, Roman, and Beach asserting that those parties had negligently and wantonly, constructed the house.
The day after the Barretts filed their second amended complaint, the trial court entered summary judgments in favor of Roman and Beach on Whitten’s third-party claims against them. On the same day, shortly after the trial court entered the summary judgments on Whitten’s third-party claims, Whitten and the Barretts moved jointly to dismiss, with prejudice, the Barretts’ claims against Whitten. In their motion to dismiss, the Barretts and Whitten asserted that they had reached a settlement agreement and that Whitten had assigned to the Barretts his claims against the . subcontractors that had worked on the. construction of the residence. • The trial court granted the motion to dismiss.
In August 2012, Roman and Beach each filed a motion for a summary judgment on the 'Barretts’ claims against him, arguing, in part, that the Barretts’ direct negligence and wantonness claims were barred by the applicable two-year statute of limitations. A week later, on August 15, -2012, the Barretts filed a. third amended complaint (styled as an “amended second amended complaint”), in which they substituted Smith, Roman, and Beach for fictitiously named defendants that had been named in the original complaint. Roman and Beach later renewed and supplemented their summary-judgment motions.
In addition to their statute-of-limitations arguments, Roman and Beach asserted that they did not owe the Barretts a duty and that the claims Whitten had assigned to the Barretts were without merit. On November 21, 2012, the trial court entered summary judgments in favor of Roman and Reach on all the Barretts’ claims. After a default judgment was entered against Smith, the Barretts timely appealed to our supreme court, which, pursuant to § 12-2-7(6), Ala.Code 1975, transferred the appeal to this court.
II. Standard of Review
The standard of appellate review of a summary judgment is settled:
“[An appellate court’s] review of a summary judgment is. de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004). “[Substantial evidence is evidence Of such weight and quality that fair-minded persons in the exercise of impartial .judgment can reason *370 ably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
III.. Analysis
A. Direct Claims of Negligence and Wantonness
i. Statute of Limitations
The Barretts raised direct claims against Roman and Beach asserting that those parties had negligently and wantonly constructed the residence. In their motions for a summary judgment, Roman and Beach argued that the Barretts’ claims were barred by the two-year statute of limitations set out in § 6 — 2—38(2), Ala.Code 1975. The Barretts do not dispute that a two-year limitations period applies or that they failed to sue Roman and Beach until more than two years after the limitations period began to run. The Bar-retts, however, assert that, pursuant to fictitious-party practice, them claims relate back to the date théy filed their original complaint and are,[1] therefore, not time-barred.[2]
The Barretts substituted Roman and Beach for fictitiously named defendants when they filed their third amended complaint on August 15, 2012.[3] The Barretts argue that, under Rules 9(h) and 15(c)(4), Ala. R. Civ. P., a claim against a defendant who is timely substituted for a fictitiously named defendant relates back to the complaint in which the fictitiously named defendant was first sued.
In Weber v. Freeman, 3 So.3d 825 (Ala.2008), our supreme court restated the following principles applicable tó the relation-b'ack doctrine and fictitious-party practice:
“ ‘[I]n order to invoke the relation-back principles of Rule 9(h), that is, in order for the amended complaint with the defendant’s true name to-relate back to the original complaint with the fictitious name, the plaintiff must establish (1) that the plaintiff was ignorant of the identity of the fictitiously named party, in the sense of having no knowledge at the time the complaint was filed that the party subsequently named was in fact the party intended to be sued, Columbia Engineering International, Ltd. v. Espey, 429 So.2d 955 (Ala.1983); and (2) that the plaintiff used due diligence to discover the defendant’s true identity before filing the original complaint, Fulmer v. Clark Equipment Co., 654 So.2d 45 (Ala.1995).’ ”
3 So.3d at 831-32 (quoting Ex parte Atkinson, 976 So.2d 1001, 1003 (Ala.2007)). “If the plaintiff knows the identity of the fictitiously named parties or possesses sufficient facts to lead to the discovery of their identity at the time of the filing of the complaint, relation back under fictitious party practice is not permitted and the running of the limitations period is not tolled.” Clay v. Walden Joint Venture, 611 So.2d 254, 256 (Ala.1992).
It is undisputed that, at or near the time the Barretts closed on the purchase of the house in February 2008, the Barretts re *371 ceived a list of some of the subcontractors who had worked on the residence. That list specifically states that Roman performed the roofing work on the house. Moreover, Robert Barrett testified during his deposition that, before the Barretts filed the lawsuit against Whitten and fictitiously named defendants, he had actually spoken to Roman on the telephone about repairing the roof. Accordingly, the undisputed evidence clearly shows that the Barretts were not ignorant of the fact that Roman was one of the defendants they intended to sue when they filed the original complaint. Thus, we affirm the trial court’s summary judgment on the Bar-retts’ direct claims against Roman asserting negligence and wantonness in the construction of the residence.
Beach’s name does not appear on the referenced list of subcontractors, and the record does not otherwise support the conclusion that the Barretts had actual knowledge when they filed their original complaint that Beach was the party they should have sued regarding the defective brick-masonry work. As noted, however, a plaintiff must use due diligence to discover a defendant’s true identity before suing a fictitiously named defendant.
“‘The test for determining whether a party exercised due diligence in attempting to ascertain the identity of the fictitiously named defendant is “whether the plaintiff knew, or should have known, or was on notice, that the substituted defendants were in fact the parties described fictitiously.” Davis v. Mims, 510 So.2d 227, 229 (Ala.1987).
“‘As evidence of due diligence, [a court] looks to, among other things, whether the plaintiff has conducted formal or informal discovery. “Although it is true that formal discovery is not the only method of determining the identity of a fictitiously named defendant, it commonly is vital to demonstrating due diligence because it provides objective evidence of the plaintiffs case activity.” Ex parte Hensel Phelps Constr. Co., 7 So.3d 999, 1004 (Ala.2008). The conducting of formal discovery does not necessarily prove due diligence, however. See, e.g., Jones v. Resorcon, Inc., 604 So.2d 370, 373 (Ala.1992) (finding a lack of due diligence where the plaintiff failed to seek a court order permitting inspection of a fan after the defendant refused to allow the plaintiffs requested access to the fan; inspection of the fan that allegedly caused the plaintiffs injury would have revealed the name of the fan’s manufacturer).
“‘[Our supreme court] has found a lack of due diligence even when a plaintiff has conducted both formal and informal discovery. See, e.g., Ex parte Mobile Infirmary Ass’n, 74 So.3d 424 (Ala.2011) (finding a .lack of due diligence where the plaintiff had inquired informally of defense counsel as to who should be the proper defendants, had searched the Alabama Secretary of State’s Web site, and had propounded interrogatories directed at determining the proper identities of the defendants, but waited until after the limitations period had expired to amend the complaint). See also Crowl v. Kayo Oil Co., 848 So.2d 930 (Ala.2002) (finding a lack of due diligence where the plaintiff was relying on interrogatories to determine the identities of the defendants, and the defendants never answered the interrogatories).’ ”
Ex parte Noland Hosp. Montgomery, LLC, 127 So.3d 1160, 1167 (Ala.2012) (quoting Ex parte Tate & Lyle Sucralose, Inc., 81 So.3d 1217, 1221 (Ala.2011)).
In the instant case, the Barretts did not exercise the required diligence. Robert Barrett testified during his deposition that, *372 before he filed the complaint, he worked with both Whitten and Fugate in an effort to remedy the problems with the construction. The Barretts alleged in their original complaint that the brick work ; on- the residence was defective. In their brief to this court, however, the Barretts do not identify any formal or informal steps, supported by the record, that they took before filing the lawsuit in an effort to identify the person or persons who should have been sued because of the defective brick work. Rather, the only effort to which the Barretts cite is their attorney’s deposing of Beach, which occurred on March 22, 2012, more than four years after the Barretts purchased the house and, shortly thereafter, discovered water leaks.
Moreover, even if a plaintiff exercises the necessary diligence before filing a complaint against fictitiously named defendants, “a plaintiff, after filing suit, must proceed in a reasonably diligent manner to determine the true identity of a fictitiously named defendant.” Ex parte FMC Corp., 599 So.2d 592, 593 (Ala.1992). Again, the only effort to which the Barretts cite is the deposition of Beach, which occurred almost two years after the Barretts filed the original complaint.' Because the Barretts did not exercise the required diligence in- attempting to discover Beach’s identity, the trial court properly concluded that the Barretts’ direct claims against Beach asserting negligence and wantbnness are time-barred.[4]
ii. Lack of Duty'
As an alternative ground for affirming the summary judgments on the Barretts’ negligence and wantonness claims, Roman and Beach argue that they did not owe a duty to the Barretts. We agree.
In Keck v. Dryvit Systems, Inc., 830 So.2d 1 (Ala.2002), our supreme court upheld a summary judgment in favor of the manufacturer, the distributor, and the installer of an exterior insulation' finishing system (“EIFS”), which allegedly had been installed incorrectly on the plaintiffs’ residence, which they had purchased from the previous owner. In affirming the judgment, the supreme court concluded that the defendants did not owe the plaintiffs a duty, notwithstanding the fact that- contractual privity is not necessarily required to establish the existence of a duty:
“‘“[Wlhere one party to a contract assumes a duty to another party to that contract, and it is. foreseeable that injury to a third party—not a party to the contract—may occur upon a breach of that duty, the prom-issor owes that duty to all those within the foreseeable area of risk.” ’
“Ex parte Grand Manor, Inc., 778 So.2d 173, 178 (Ala.2000) (quoting Harris v. Board of Water & Sewer Comm’rs of the City of Mobile, 294 Ala. 606, 613, 320 So.2d 624 (1975)).
[[Image here]]
“In the present case, the ... defendants did not enter into a contract to manufacture and apply the EIFS to a house owned by the (plaintiffs}. As subsequent purchasers of the house, the [plaintiffs] had no relationship with, and no other contact with, the builder of the house or any of the' ... defendants. Because the [plaintiffs] did not enter into a contract with the ... defendants *373 to apply the EIFS to the house, because the [plaintiffs] were not the intended purchasers of the house when the EIFS was applied during the construction of the house, and because the ... defendants could, not have anticipated when or if the [plaintiffs] would purchase the house, the ... defendants owed the [plaintiffs] no duty to manufacture and apply the EIFS with reasonable care.”
Id. at 9-10.
Roman and Beach did not enter into contracts to perform the roofing and brick-masonry work on a house owned by the Barretts. The Barretts did not have an agreement with Whitten or anyone else for the construction of the residence. The Barretts were not the intended purchasers of the house when it was constructed. The Barretts did not have contracts with Roman or Beach. Thus, like the defendants in Keck, Roman and Beach could not have anticipated when or if the Barretts would purchase the house.
. The Barretts assert that Keck is distinguishable because, they say, they purchased them house directly from the builder, Whitten, whereas the plaintiffs in Keck purchased their house from the first owner. That argument is unpersuasive, however, because the conclusion in Keck was based primarily on the fact that the defendants in that case were not participating in the construction of a house intended to be occupied by the particular plaintiffs and could not have anticipated that those plaintiffs would purchase the house. The fact that Whitten may have been the builder, in addition to being the original owner, is a distinction without a difference.
The Barretts also argue that Keck is inapplicable to their negligence and wantonness claims because, they say, the alleged duty owed by Roman and Beach is not based on agreements those defendants had with the builder of the house* but, rather, on duties imposed by their licenses with the City of Huntsville to engage in residential construction. The Barretts do not, however, cité any''authority for the proposition that'such a license imposes a duty upon a contractor that would support a private cause of action by the subsequent purcháser of a residence for property damage caused by faulty construction. See Harris v. Owens, 105 So.3d 430, 436 (Ala.2012) (discussing Rule 28, Ala. R.App. P., and an appellant’s duty to demonstrate error on the part of-the trial court by supporting his or her arguments with citations to supporting authority).
The Barretts have- not shown that Roman and Beach owed them a duty, which is an essential element of negligence and wantonness claims. See McKelvin v. Smith, 85 So.3d 386, 390 (Ala.Civ.App.2010). Thus,, the trial court correctly entered the summary judgments in favor- of Roman and Beach .on the Barretts’ direct negligence and wantonness claims. .
B. Assigned Claims
i. Lack of Evidence of Assignment
As noted, the Barretts asserted in their second and third amended complaints that Whitten had assigned them his rights to make any claims against the subcontractors that had worked on the construction of the residence. Pursuant to that assignment, counsel for both the Barretts and Whitten filed a joint stipulation of dismissal in which they expressly stipulatéd that Whitten had assigned his claims to the Barretts. Thus, - Whitten’s own counsel has expressly admitted that the assignment took place and that his client no longer has interests in the claims. , Of course, statements of counsel are not evidence. Hicks v. Jackson Cnty. Comm’n, 990 So.2d 904, 905 n. 1 (Ala.Civ.App.2008). Accordingly) Roman and Beach argue that there is no actual evidence in the record *374 indicating that Whitten had indeed assigned his claims to the Barretts.[5]
In support of their motions for a summary judgment, Roman and Beach did not argue to the trial court that there was no evidence of an assignment. Indeed, it appears that all the parties below operated under the assumption that an assignment had, in fact, occurred. Thus, the Barretts assert, this court should disregard the argument.[6]
It is true that this court will affirm a trial court’s judgment on any valid legal ground supported by the record. That rule, however, “fails in application ... where a summary-judgment movant has not asserted before the trial court a failure of the nonmovant’s evidence on an element of a claim or defense and therefore has not shifted the burden of producing substantial evidence in support of that element....” Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2008). Because Roman and Beach never shifted the burden on this issue to the Barretts, this court will not affirm on the basis of the lack of evidence of an assignment.[7]
ii. Alleged Failure to Appeal the Summary Judgments in Favor of Roman and Beach on Whitten’s Claims
Beach argues in his brief to this court that the Barretts did not appeal from the summary judgments in favor of Roman and Beach on Whitten’s third-party claims and, thus, cannot argue on appeal that the trial court erred in entering summary judgments against the Barretts as assignees of those claims. Beach points out that the Barretts did not identify in their notice of appeal the summary judgment against Whitten as one of the judgments from which the Barretts were appealing. Assuming that the Barretts were required to formally appeal from that judgment, Rule 3(c), Ala. R.App. P., specifically states that the designation in a notice of appeal of the judgment to be reviewed “shall not ... limit the scope of appellate review.” Accordingly, we reject Beach’s argument.

Merits

It is undisputed that, pursuant to the assignment from Whitten, the Barretts asserted claims against Roman and Beach of breach of express and implied warranties regarding their work, labor, and materials; common-law indemnity; and breach *375 of duty “to exercise reasonable care, and to comply with [their] contractual and warranty obligations.” There appears to be some confusion as to whether the Barretts’ additional-claims asserting breach of an implied warranty of good workmanship and breach of contract were also assigned claims (see supra note 1). In any event, those claims appear to be subsumed by the claims asserting breach of express and implied warranties and breach of duty “to comply with ... contractual obligations,” which undisputedly were assigned by Whitten.
Roman and Beach, by adopting Roman’s arguments, asserted in support of their summary-judgment motions that there could be no breach of an express warranty unless Roman and Beach had written contracts with Whitten. They also argued that there could be no breach of an implied warranty unless (1) Roman and Beach had built a new residence for Whitten, (2) Whitten bought the new residence from .Roman and Beach, and (3) there was an express warranty to build the residence per plans and specifications. The Barretts do not address those arguments on appeal. Accordingly, the summary judgments on the Barretts’ claims alleging breach of express and implied warranties regarding work, labor, and materials and breach of an implied warranty of good workmanship are due to be affirmed. See Soutullo v. Mobile Cnty., 58 So.3d 733, 739 (Ala.2010) (“[T]he failure of the appellant to discuss in the opening brief-an issue on which the trial court might have relied as a basis for its judgment[ ] results in an affirmance of that judgment.”).
In further support of their summary-judgment motions, Roman and Beach argued that all of the Barretts’ assigned claims were based on contracts entered into by Whitten or Fugate that were illegal because Whitten or Fugate, or both, should have been licensed under the Alabama Home Builders Licensure Act (“the Act”), § -34-14A-1 et seq., Ala.Code 1975. See § 34-14A-5, Ala.Code 1975 (“All residential home builders shall be required to be licensed by the Home Builders Licen-sure Board annually.”). Section 34-14A-14, Ala.Code 1975, provides, in part, that “[a] residential home builder, who does not have the license required, shall not bring or maintain any action to enforce the provisions of any contract for residential home building which he or she entered into in violation of this' chapter.” According to Roman and Beach, because the Barretts.’ assigned claims are based on contracts entered into by Whitten or Fugate that violate the Act, the Barretts are barred from pursuing those claims.
The Barretts respond with, the assertion that Whitten was the builder on the project and that Fugate was simply his agent for purposes of choosing subcontractors and entering into contracts on Whitten’s behalf. : Thus, they argue, it is irrelevant that Fugate was not licensed.
As the Barretts assert, “a summary judgment on the issue of agency is generally inappropriate because agency is a question of fact to be determined by the trier of fact.” Kennedy v. Western Sizzlin Corp., 857 So.2d 71, 77 (Ala.2003). “ ‘This is not to.say, however, that agency may be presumed; .the party asserting it has the burden of adducing [substantial] evidence to prove its existence.’ ” Id. (quoting Wood v. Shell Oil, 495 So.2d 1034, 1035-36 (Ala.1986) (alteration in Kennedy)). The Bar-retts point out that Whitten, not Fugate, paid Roman and Beach for their work. Roman and Beach essentially ignore this fact and do not provide any explanation as to why Whitten would provide the consideration for Roman’s and Beach’s performance under their subcontracts if Whitten was not a party to those contracts. In *376 deed, Roman • conceded in his summary-judgment motion that “Whitten gave Fu-gate full authority to act as his agent, with power to select, hire, and fire subcontractors,” and Beach adopted and incorporated all of Roman’s arguments. Thus, this court cannot conclude that there is no question of fact as to whether Fugate acted as Whitten’s agent and entered into the subcontracts on his behalf.[8]
The Barretts vigorously argue that a property owner, such as Whitten, cannot be barred from enforcing his or her contract with an unlicensed homebuilder. They do not, however, assert that an unlicensed homebuilder can enforce his or her subcontracts, nor do they cite any authority for that proposition. Accordingly, it is not disputed in this case that, if Whitten was required to be licensed as a home-builder when he entered into the subcontracts with Roman and Beach, then Whit-ten (and' by assignment, the Barretts) cannot recover on the assigned claims. See also § 34-14A-14, Ala.Code 1975 (“A residential home builder, who does not have the license required, shall not bring or maintain any action to enforce the provisions of any contract for residential home building which , he or she entered into in violation of this. chapter.” . (Emphasis added.)).
The Barretts argue that Whitten was not required to have a homebuilder’s license because, they say, he was an “owner builder” who was exempt from the licensing requirements. The Barretts suggest that a builder, 'who initially decides to build a residence for himself or herself, never has to be licensed, even if he or she decides before construction is complete that he or she will not occupy the residence and, instead, will sell it once it is finished. We disagree.
Under § 34-14A~5(a), Ala.Code 1975, “[a]ll residential home builders shall be required to be licensed_” Section 34-14A-2(10), Ala,Code 1975, defines “residential home builder,” in relevant part, as “[o]ne who constructs a residence ... for sale” and provides that “[a]nyone who engages or offers to engage in such undertaking in this state shall be deemed to have engaged in the business of residential home building.” At least from the time Whitten determined that he was going to construct the house for sale, he was a “residential home builder,” who was “engaged in the business of residential home building,” under § 34-14A-2(10).
The Barretts rely primarily on § 34-14A-6(5), Ala.Code 1975, which provides an exemption from the homebuilder licensing requirements' for “[o]wners of property when acting as their own contractor and providing all material supervision themselves, when building or improving one-family or two-family residences on such property for the occupancy or use of such owners and not- offered for sale.”- The plain language of § 34-14A-6(5) exempts owners of property from the licensing requirements “when building or improving one-family or two-family residences on such property for the occupancy or use of such oumers and not offered for sale.” (Emphasis added.) Obviously, once Whit-ten decided that he would not occupy the house and, instead, would sell it,-he was no longer “building or improving ... [a -residence] on [his] property for the occupancy or use of [himself] and not offered for sale.”
The Barretts emphasize an additional portion of the exemption set out in § 34-14A~6(5), which provides:
“In any action brought under this chapter [for a violation of the licensing *377 requirements], proof of the sale or offering for sale of such structure by the owners of property, as provided .in this subdivision, within one year after completion of same is presumptive evidence that the construction was undertaken for the purpose of sale.”
(Emphasis added.) The Barretts suggest that the use of the phrase “was undertaken” shows that the legislature intended to require licensure' of only those builders who, at the time they first start building a residence, intend to sell the residence, and not to those that set out initially to build their own residence but, during construction, change their minds.
We disagree that that portion of § 34-14A-6(5) was intended to modify or qualify the provision exempting property owners “when” they are building or improving residences for their own occupancy or use. The term “undertaken” does not necessarily refer to the first time construction begins. Black’s Law Dictionary 1759 (10th ed.2014), defines “undertake,” in part, as “[t]o take on an obligation or task.”,. A property owner can begin construction for purposes of his or her own occupancy and, at a later time, take on the obligation or task of construction for the purpose of sale.
Moreover, the legislature’s purpose in enacting the Act was as follows:
“In the interest of the public health, safety, welfare, and consumer protection and to regulate the home building and private dwelling construction industry, the purpose of this chapter, and the intent of the Legislature in passing it, is to provide for the licensure of those persons who engage in home building and private dwelling construction, including remodeling, and to provide home building standards in' the State of Alabama. The Legislature recognizes that’ the home budding and home improvement construction industries are significant industries. Home .builders may pose significant harm to the public when unqualified, incompetent, or dishonest home , building contractors and remode-lers provide inadequate, unsafe, or inferior building services. The Legislature finds it necessary to regulate the residential home building and remodeling construction industries.”
§ 34-14A-1, Ala.Code 1975. See also Hooks v. Pickens, 940 So.2d 1029, 1031-32 (Ala.Civ.App.2006) (stating that the purpose of the homebuilder licensing requirements is the protection of the public from unqualified, incompetent, or dishonest homebuilders). The legislature’s purpose would be defeated if a property owner, who has not met the requirement's- for obtaining a hom'ebuilder’s license, could start building a residence for himself or herself and, at any point during the construction, decide to sell the residence' to a member of the public. “Because the Act was intended for the benefit of the public, our caselaw requires that it be construed most, favorably to the public.” State Home Builders Licensure Bd. v. Sowell, 699 So.2d 214, 219 (Ala.Civ.App.1997) (superseded by statute on other grounds, as recognized in Hutchenson v. Daniel, 53 So.3d 909, 915 (Ala.Civ.App.2009)).
The Barretts also contend that the definition of “residential home builder,” referenced above,"actually supports their position that Whitten never had to be licensed. Specifically, the Barretts emphasize a portion near'the end of § 34-l4A-2(10), which defines “residential home builder” as
“[o]ne who constructs a residence or structure for sale or who, for a fixed price, commission, fee, or wage, undertakes or offers to undertake the construction or superintending of the construction,- or who - manages, supervises, assists, - or provides consultation to ■ a *378 homeowner regarding the construction or superintending of the construction, of any residence or structure which is not over three floors in height and which does not have more than four units in an apartment complex, or the repair, improvement, or reimprovement thereof, to be used by another as a residence when the cost of the undertaking exceeds ten thousand dollars ($10,000). Nothing herein shall prevent any person from performing these acts on his or her own residence or on his or her other real estate holdings. Anyone who engages or offers to engage in such undertaking in this state shall be deemed to have engaged in the business of residential home building.”
(Emphasis added.) The Barretts suggest that, pursuant to the above-emphasized language, the owner of a piece of real property may, without a license, perform all the acts referenced in § 34-14A-2(10), one of which is the construction of a residence for sale. We disagree.
The Barretts’ argument would require this court to conclude that the legislature, in the first portion of the definition of “residential home builder,” indicated that such term encompasses those persons that build residences with the intent to sell them and, at the end of the very same definition, indicated the opposite. Accepting the Barretts’ argument would render the first portion of .the definition meaningless. “[T]he Legislature will not be presumed to have done a futile thing in enacting a statute; there is a presumption that the Legislature intended a just and reasonable construction and did not enact a statute that has no practical meaning.” Weathers v. City of Oxford, 895 So.2d 305, 309 (Ala.Civ.App.2004).
It is our opinion that, in stating that the definition of “residential home builder” should not be construed to preclude a person from performing “these acts” on his or her own residence or on his or her other real-estate holdings, the legislature intended to make clear that property owners wanting to build residences or structures for their own occupancy, or to make improvements or repairs thereto, are not required to become licensed home-builders first. Our conclusion is buttressed by the exemption set out in § 34-14A-6(5) for “owner builders,” which is clearly intended to exempt those property owners that are building their own residences. See Hooks v. Pickens, 940 So.2d 1029, 1031 (Ala.Civ.App.2006) (indicating that the Act must be interpreted as a whole).
Moreover, the expressly stated legislative purpose of protecting the public from unqualified, incompetent, or dishonest homebuilders would be defeated if property owners could build residences for sale without being licensed. A developer would be at liberty to buy real property and build houses for sale to the public without undergoing the vetting necessary to obtain a homebuilder’s license. We do not believe the legislature intended such a result. See State Home Builders Licensure Bd. v. Sowell, supra (stating that the Act must be construed most favorably to the public). We thus conclude that Whitten was required to be licensed at least from the point in time when he was no longer constructing the residence for himself.
Although the Barretts do not dispute that Whitten could not recover via any theory of liability if he entered into the subcontracts with Roman and Beach while required to be licensed, the Barretts assert that there is “no evidence Whitten changed his mind about occupying the house at the time the contracts [with Roman and Beach] were entered into.” (Emphasis added.) Notably, however, the Barretts do not affirmatively assert that *379 Whitten did not change his mind until after Roman and Beach were hired, and they do not cite any evidence that would support such a conclusion.
Whitten testified as follows regarding his decision that he would not occupy the residence:
“[Counsel for the Barretts:] Q. ... In your own words, tell me a little bit about the role that Robert [Fugate] played in building your house....
“A. ... We started it.
“And after a while, you know, it was like I can’t do it. It’s too much time, too many problems there. So, at the framing stage I asked him to go ahead and finish it, basically split the profit with me. So that’s what happened.
[[Image here]]
“Q. ... Once the footing is poured, then the block mason would show up and start doing the perimeter of the foundation before the framing would, start. Was this before you had decided that this house may not be for you and your family and be soldi
“A. No.
[[Image here]]
“Q. After the block foundation was finished, the next thing that should have been done would be the framing where they started putting the wood on top of the block foundation. Is that about the time that you said that things started to change for you and your expectations?
“A. That’s when — yes. During the framing is when I went to [Fugate] and said, you know, if you can finish this up for me, then we’ll just split the profit, if there is any.
[[Image here]]
“Q. Can you give me your best recollection about what stage the house was at or what would have been the first subcontractor that was working on the job when Robert [Fugate] began doing this for a fee as opposed to doing it as a favor?
[[Image here]]
“THE WITNESS: It was during the framing stage.
“Q. ... But the framer had not been— not completed his work?
“A. Right.
[[Image here]]
“Q. You said you gave up or you decided not to finish building the house for yourself sometime certainly before the framing was done; is that right?
“A. Correct.”
(Emphasis added.) Thus, Whitten’s testimony indicates that he delegated to Fu-gate the primary responsibility for construction “during the framing stage” but that he had actually decided that he would not occupy the house at some point before framing even started.
Beach’s and Roman’s testimony indicates that they were hired at a stage of construction that occurred after Whitten had decided that he would not occupy the residence. Specifically, Beach, the brick mason, testified as follows regarding the point in time at which he was hired:
“[Counsel for the Barretts:] Q. Do you remember how you got involved in that, how you may have met Mr. Fugate for the first time or became acquainted with him?
“A. I do. I was bricking a house for Ricky Clark kind of catty-corner to this house here and just walked over there. I was finishing up this project within a week, so I walked over there and talked to Robert [Fugate] and asked — walked in the garage and said, ‘Is the builder here?’
“And Robert Fugate spoke up and said it was him. And I said, Well, ‘I’d *380 like to ... do your brick job for you, if you don’t mind.’
“He said, ‘How much?’
“And I told him. And he said, ‘Okay.’ ”
(Emphasis added.)
Roman, the roofer, testified as follows:
“[Counsel for the Barretts:] Q.... Do you remember meeting somebody and talking to them about this house, discussing the fact.that you would do this job in the first meeting?
“A. I do not remember. The only thing I remember is that it was a phone call.
[[Image here]]
“Q. All right. Was the phone call you’re referring to from Mr. Fugate?
“A. It was from Mr. Fugate.
[[Image here]]
“Q. Okay. So you had a call from Mr. Fugate. And even if you can’t remember exactly what was said, he was interested in your roofing services?
“A. Correct.
“Q. Did you agree to meet, or did you make a deal on the phone, or do you recall? ■
“A. I think we met, met up one time.
“Q. Did you meet at the house?
“A. Yes.
“Q. Tell me about the meeting, what you can recall.
“A. We only talk [sic] about when the roofing was going to be shipped out to the jobsite, when we were going to start. That was it,, and agree on the price_
“Q. All right. Was the house almost ready for roofing? .Do you remember what stage the house was in?
“A. I believe it was, I would say, a week away.”
(Emphasis added.)
Beach’s testimony shows that he was hired at a point in time when the garage of the residence had already taken shape, and Roman’s testimony shows that he was hired only a week away from the start of the roofing. As noted, Whitten testified that, before framing even started, he had already decided he would not live in the residence once it was finished. Thus, the record is clear that there is no genuine issue of fact regarding whether Roman and Beach entered into their subcontracts at a time when Whitten was required to be licensed as a homebuilder. Accordingly, the trial court correctly entered the summary judgments in favor of Roman and Beach on all the Barretts’ assigned claims.[9]
AFFIRMED.
THOMPSON, PJ.j and THOMAS, MOORE, and DONALDSON, JJ., concur.

. The second amended complaint does mot clearly indicate that the Barretts obtained those specific two causes of action via the assignment from Whitten, although the Bar-retts malte that assertion on appeal.

. The parties do not state exactly when the Barretts were allegedly damaged. Accordingly, it is not clear to this court whether the original complaint itself was filed within two years of the date the limitations period began to run. There is, however, no dispute that the Barretts did not substitute Roman and Beach for fictitiously named defendants until after the two-year limitations period expired.

. The Barretts claim that they intended to substitute Roman and Beach for fictitiously named defendants in their second amended complaint, which was filed on July 26, 2012. It is clear, however, that they did not actually do so until they filed the third amended complaint.

. The Barretts also argue that, in order to avoid relation back, Roman and Beach were required to show that they were actually prejudiced by their substitution for' fictitiously named defendants. None of the cases the .Barretts cite in support of their argument, however, involved fictitious-party practice, much less a lack of diligence in determining the true identity of a fictitiously named defendant. • •

. The Barretts attach a copy of a written assignment, which does not appear in the appellate record, as an appendix to their reply brief. Beach has moved to strike the appendix. Because this court cannot consider matters outside the appellate record, Beach’s motion is well taken, and, accordingly, Beach’s motion to strike is granted. See Etherton v. City of Homewood, 700 So.2d 1374, 1378 (Ala.1997) (stating that appellate courts will not consider matters outside the appellate record).

. We also note here that Roman and Beach did not support their summary-judgment motions with an argument that the type of claims assigned by Whitten cannot, as a matter of law, be validly assigned. We express no opinion as to that issue.

.Roman and Beach assert that, without an assignment, the Barretts did not have standing to pursue the allegedly assigned claims and that, therefore, the trial court lacked subject-matter jurisdiction over those claims. We disagree. Cf. Ex parte Simpson, 36 So.3d 15, 24-25 (Ala.2009) (holding that the doctrine of real party in interest, as opposed to standing, was implicated by the issue whether a party was entitled to sue a governmental entity alleging inverse condemnation after the party allegedly had assigned away its rights to litigate, and to recover compensation for, governmental takings). See generally Ex parte BAC Home Loans Servicing, L.P., 159 So.3d 31 (Ala.2013) (discussing standing and distinguishing that concept from others, such as real party in interest and failure to state a claim).

. We express no opinion as to whether Fugate was also bound by the pertinent contracts.

. It is not necessary for the court to decide whether the fact that Whitten should have been licensed when Roman and Beach actually performed the work under their subcontracts would also bar the assigned claims against Roman and Beach,